# IN THE SUPREME COURT OF IOWA

No. 18–2173

Filed June 30, 2020

**KAREN COHEN,**

Appellant,

vs.

**DAVID CLARK** and **2800-1 LLC,**

Appellees.

---

Appeal from the Iowa District Court for Johnson County, Chad Kepros, Judge.

A tenant appeals a district court ruling dismissing her claims against her landlord and a neighboring tenant stemming from the landlord's waiver of its no-pets provision in the lease to accommodate the neighboring tenant's emotional support animal. **REVERSED AND REMANDED.**

Christopher Warnock of The Tenants' Project, Iowa City, for appellant.

Amy L. Evenson of Larson & Evenson, Iowa City, for appellee David Clark.

Erek P. Sittig of Holland, Michael, Raiber & Sittig, PLC, Iowa City, for appellee 2800-1 LLC.

**CHRISTENSEN, Chief Justice.**

This case involves a tenant with pet allergies who moved into an apartment building due to its no-pets policy, a neighboring tenant who sought a waiver of the no-pets policy for his emotional support dog, and a landlord in a pickle trying to accommodate both of them. In an attempt to please both parties, the landlord allowed the emotional support dog on the premises while requiring the two tenants to use different stairways and providing an air purifier for the tenant with pet allergies. These measures failed to prevent the tenant from suffering allergic attacks. She sued the landlord and her neighboring tenant in small claims court for breach of the lease's no-pets provision and interference with the quiet enjoyment of her apartment. As a defense, the landlord asserted that its waiver of the no-pets policy was a reasonable accommodation that it had no choice but to grant under the Iowa Civil Rights Act (ICRA).

The small claims court dismissed the case, concluding the landlord's accommodations were reasonable. On appeal to the district court, the district court concluded the landlord should have denied the emotional support dog request due to the other tenant's pet allergies but dismissed the case due to the uncertainty of the law governing reasonable accommodations for emotional support animals. Both tenants filed applications for discretionary review, and the landlord filed a consent to discretionary review. We granted discretionary review and retained the appeal.

Under our highly fact-specific inquiry that balances the parties' needs, we conclude the landlord's accommodation of the emotional support dog was not reasonable because the tenant with pet allergies had priority in time and the dog's presence posed a direct threat to her health. We also conclude that the tenant suffering allergic attacks was entitled to

recover on her claims of breach of lease and breach of the covenant of quiet enjoyment and remand for an award of her requested damages of one month's rent. To be clear, our holding today is based on the specific facts of this case. Our balancing in this case is not a one-size-fits-all test that will create the same result under different circumstances, such as when the animal at issue is a service animal for a visually disabled person. Nevertheless, the fact that the tenant with allergies was first in time and the dog posed a direct threat to her health tips the balance in her favor in this case. Thus, we reverse the district court's dismissal.

## I. Factual and Procedural Background.

Karen Cohen has a medically documented severe allergy to pet dander that causes nasal congestion, swollen sinuses, excess coughing, and, at times, a swollen throat. Her allergic reaction is more severe when she is exposed to cats, compared to dogs, requiring her to carry an EpiPen to protect against anaphylactic shock if she is exposed to cat dander. Cohen's allergy to cats used to be the same as her allergy to dogs but progressed through repeated exposure, and she worried that her allergy to dogs would similarly progress if she were repeatedly exposed to their dander.

Due to her severe pet allergies, Cohen sought an apartment building that did not allow pets. On November 11, 2015, she entered into a written lease agreement to rent an apartment from 2800-1 LLC at a rent of $1464 per month in Iowa City for the term of July 21, 2016 to July 12, 2017. In deciding to enter a lease agreement with 2800-1 LLC, Cohen relied upon section 53 of the written agreement, which states,

> No pets are allowed in the building or on the Premises at any time. Tenants may be assessed labor cleanup charges (if applicable) for each violation. Tenants agree to an increase in the rental deposit up to the maximum allowed by law in the

events of non-compliance with pet prohibitions. Reasonable accommodations accepted.

On January 18, 2016, approximately two months after Cohen entered into her lease, David Clark entered into a written lease agreement with 2800-1 LLC to rent an apartment down the hall from Cohen's for the term of July 21, 2016 to July 12, 2017. Clark's lease contained the same no-pets provision as Cohen's lease. After Clark's and Cohen's leases began, Clark presented 2800-1 LLC with a letter from his psychiatrist on or around August 23, which explained Clark's chronic mental illness causing "impairment in his ability to function." The psychiatrist noted,

> Research has shown that pets are therapeutic and beneficial to physical and mental health. In my professional opinion, owning and caring for a dog would benefit his health and well-being. Please allow David to include a pet on his lease.

Clark requested a reasonable accommodation to have his emotional support animal (ESA), a dog, with him on the apartment premises.

Jeffrey Clark (no relationship to plaintiff), the leasing and property manager, notified the other tenants in the building of the request to accommodate the ESA and inquired about whether any tenant had allergies to dogs. Cohen responded, detailing her allergies to cats and dogs and the symptoms associated with those allergies. After receiving Cohen's response, Jeffrey contacted the Iowa Civil Rights Commission (ICRC) and requested the ICRC's review or a formal agency determination even though no party ever filed a complaint. Jeffrey explained to the ICRC employee over the phone that 2800-1 LLC had apartments in other buildings available that allowed pets and could accommodate Clark's request by renting him a different apartment in a different building. The ICRC staffer advised Jeffrey that moving Clark to another building was not a reasonable accommodation and informed Jeffrey that he had to try to reasonably accommodate both Cohen's allergies and Clark's ESA rather than deny

Clark's ESA request. There was no finding by the ICRC that allowing Clark's ESA in the building despite Cohen's allergic reactions would be a reasonable accommodation.

2800-1 LLC allowed Clark to have his ESA join him on the apartment premises while trying to mitigate Cohen's allergies. In doing so, 2800-1 LLC had Cohen and Clark use separate assigned stairwells in an effort to keep Cohen free of the ESA's dander. 2800-1 LLC also purchased an air purifier for Cohen's apartment to minimize her exposure to pet dander inside the apartment. 2800-1 LLC explored installing "air lock" doors on each of the four floors of the apartment building to reduce the amount of air infiltration but ultimately decided it was not financially feasible because the cost estimate of doing so was $81,715.92.

The year-long accommodation efforts were insufficient to prevent Cohen from having allergic reactions to the ESA, and she had to limit the amount of time she spent in her apartment building. Cohen testified that her "nose was constantly stuffy" and her "sinuses were swollen." She further testified that "[f]or a certain period of time [her] throat did feel like it was starting to swell." Cohen thought perhaps someone was fostering a cat for a brief period of time when her throat was swelling up because that is a symptom she typically experiences when exposed to cats. However, she continued to experience other side effects of her allergy to dogs as well as cats throughout her time living in the apartment building. She explained that she was "constantly coughing or trying to get excess mucus out of [her] vocal fold area," as if she had a permanent cold. Cohen was taking multiple allergy medicines in addition to her daily allergy medication, including Benadryl every night, nasal sprays, and twice-a-day nasal rinses.

On September 27, 2017, Cohen brought a small claims action against 2800-1 LLC and Clark seeking one month's rent as damages. Cohen alleged 2800-1 LLC breached the express covenant of her lease that provided for no pets and the implied warranty of quiet enjoyment by allowing Clark to have his dog on the premises as an ESA. She also alleged Clark, through the presence of his ESA, violated her quiet enjoyment of her unit under Iowa Code section 562A.17(7) (2017), Iowa's landlord and tenant law. 2800-1 LLC asserted as a defense that it had to reasonably accommodate Clark's ESA under Iowa Code section 216.8A(3)(*c*)(2), the ICRA. 2800-1 LLC cross-claimed for indemnification from Clark for any damage to Cohen.

Following a January 24, 2018 hearing on the matter, the small claims court dismissed Cohen's case on July 1. The small claims court concluded 2800-1 LLC made reasonable accommodations of both Clark's and Cohen's needs.[1] Consequently, the small claims court determined Cohen had no claim for breach of contract or quiet enjoyment. The small claims court also explained there was no authority under Iowa law to allow a claim between cotenants for Cohen's claim against Clark for breach of quiet enjoyment.[2] Cohen filed a timely notice of appeal to the district court three days later.

---

[1]The small claims court thought 2800-1 LLC made reasonable accommodations largely because it noted Cohen failed to adequately inform 2800-1 LLC that she was continuing to have problems with her allergic response to the dog despite 2800-1 LLC's measures to mitigate her allergy. The district court amended the small claims court's factual finding that Cohen failed to adequately inform 2800-1 LLC that its accommodations were not working to alleviate her allergy, finding instead that 2800-1 LLC was aware its attempts to accommodate Cohen's allergy had failed.

[2]Cohen waived her claim against Clark on appeal to the district court, acknowledging 2800-1 LLC would be liable for any breach of contract rather than Clark. The parties have likewise not briefed that issue on appeal to our court, so we deem Cohen's argument that Clark is liable for breach of quiet enjoyment waived and do not consider it further. *In re Estate of Waterman*, 847 N.W.2d 560, 568 n.11 (Iowa 2014)

On appeal to the district court, the district court concluded 2800-1 LLC made sufficient efforts that would have justified denying Clark's request for reasonable accommodation or asking him to move to another apartment building. The district court explained,

> That conclusion is based on the good faith effort to make a reasonable accommodation and the inability to identify a solution to mitigate the harm to the health and safety of Ms. Cohen. In essence, having attempted to accommodate the request and being unable to do so, the Landlord could and should have denied Mr. Clark's request at that point.

Nevertheless, the district court dismissed Cohen's claims against 2800-1 LLC and Clark because, at the time these developments took place, the law was "not clear." The district court reasoned,

> The Landlord did consult with the Iowa Civil Rights Commission and acted on their advice. [It] took significant steps to accommodate both parties to the best of [its] ability and resources. Therefore, the need for a new and clearer test may remain outstanding in the Iowa courts, but under the law as it was, Landlord did not believe [it] had the option to decline the request and [it] made every effort to mitigate the effect of that result on Ms. Cohen.

Cohen filed an application for discretionary review on December 10. 2800-1 LLC subsequently filed a consent to discretionary review on January 3, 2019, and Clark filed an application for discretionary review on January 8. We granted the parties' requests for discretionary review and retained the appeal.

## II. Standard of Review.

"In a discretionary review of a small claims decision, the nature of the case determines the standard of review." *De Stefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 164 (Iowa 2016) (quoting *GE Money Bank v. Morales*, 773 N.W.2d 533, 536 (Iowa 2009)). The parties agree

("[The parties] have not briefed that issue on appeal. We therefore deem this argument waived and need not consider it further here.").

that we review small claims actions tried at law for correction of errors at law. *Id.* This includes a review of statutory construction. *Id.* They also agree that we are bound by the district court's factual findings on appeal if they are supported by substantial evidence. *Id.*

Courts vary in their determination of whether a reviewing court must treat the issue of a reasonable accommodation determination as a question of fact or a mixed question of law and fact.[3] We typically review the lower court's reasonable accommodation determination as a factual finding by the district court. *See Palmer Coll. of Chiropractic v. Davenport Civil Rights Comm'n*, 850 N.W.2d 326, 342–43 (Iowa 2014) (collecting cases

---

[3]*See, e.g.*, *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) ("The reasonableness of a proposed accommodation is a question of fact."); *Reyazuddin v. Montgomery County*, 789 F.3d 407, 416 (4th Cir. 2015) (noting the question of a reasonable accommodation is a question of fact); *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) ("The reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder."); *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013) ("Whether an accommodation is reasonable is a question of fact."); *Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, 1146 (10th Cir. 2011) ("Whether part-time work 'is a reasonable accommodation under the ADA is a mixed question of law and fact involving primarily legal principles.' " (quoting *Smith v. Diffee Ford–Lincoln–Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002))); *EEOC v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010) ("The reasonableness of an accommodation is ordinarily a question of fact." (quoting *Lujan v. Pac. Mar. Ass'n*, 165 F.3d 738, 743 (9th Cir. 1999))); *EEOC v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007) ("Whether an accommodation is reasonable is a question of fact to be decided by a jury."); *Buskirk v. Apollo Metals*, 307 F.3d 160, 170 (3d Cir. 2002) ("Generally, the question of whether a proposed accommodation is reasonable is a question of fact."); *Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998) ("The reasonableness of a requested accommodation is a question of fact."); *Carter v. Bennett*, 840 F.2d 63, 64–65 (D.C. Cir. 1988) (noting the ultimate determination of whether government provided reasonable accommodation to person with disability is not a question of pure fact but a mixed question of law and fact); *Aubrey v. Koppes*, 383 F. Supp. 3d 1203, 1215 (D. Colo. 2019) ("Whether an accommodation is reasonable under the ADA is a mixed question of law and fact." (quoting *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004))), *appeal docketed*, No. 19–1153 (10th Cir. Apr. 29, 2019); *Warren v. Delvista Towers Condo Ass'n*, 49 F. Supp. 3d 1082, 1088 (S.D. Fla. 2014) ("[W]hether [an ESA] poses a direct threat that cannot be mitigated by another reasonable accommodation[] is not a question of law, it is distinctly a question of fact."); *Tate v. Potter*, No. 04–61509, 2008 WL 11400757, at *5 (S.D. Fla. Mar. 25, 2008) (holding that a reasonable accommodation is "not a simple question of fact" but "a mixed question of law and fact").

holding that Americans with Disabilities Act reasonable accommodation determinations are typically resolved as questions of fact). Nevertheless, we have not expressly considered whether a reasonable accommodation is a question of law or fact when the accommodation at issue is based on the parties' stipulated facts.

While at least one federal appellate court has suggested that a reasonable accommodation determination involving stipulated facts presents a question of law because the "matter involves an application of the law to the undisputed factual determinations," *Arneson v. Heckler*, 879 F.2d 393, 397 (8th Cir. 1989), there are both factual and legal issues that we must consider in determining whether a landlord has made a reasonable accommodation because we must examine whether the stipulated facts satisfy the legal standard. *See Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, 102 S. Ct. 1781, 1790 n.19 (1982) (declaring "questions in which . . . the issue is whether the facts satisfy the statutory standard" are mixed questions of law and fact). Here, we are reviewing the parties' stipulated facts, the district court's factual findings concerning the landlord's efforts to accommodate both tenants' needs, and the district court's conclusion of law that those efforts were sufficient to justify denying the disabled tenant's ESA request. Accordingly, the issue of whether the accommodation in this case was reasonable is a mixed question of law and fact. As such, we are bound by the district court's factual findings so long as they are supported by substantial evidence, *De Stefano*, 879 N.W.2d at 164, but our review of the district court's legal conclusion involves a question of law that we review for the correction of errors at law. *See Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 445 (Iowa 2016).

### III. Analysis.

**A. The Issues Before Us.** This is an action for breach of the lease and breach of the implied covenant of quiet enjoyment. The small claims court found no breaches occurred because the ESA was a reasonable accommodation. On appeal to the district court, the court came to the same result on a different rationale. It concluded that it would have been appropriate to deny Clark's ESA given its impact on Cohen but that 2800-1 LLC acted in good faith and the law was uncertain. Given these circumstances, the district court decided that Cohen's claim should be dismissed. This brings us to the present appeal.

Appellant Cohen argues that Clark's ESA was not a reasonable accommodation under the circumstances and that the uncertain state of the law does not relieve 2800-1 LLC from liability for breach of her lease and breach of her covenant of quiet enjoyment. There are two appellees in this case—2800-1 LLC and Clark. Appellee 2800-1 LLC argues three points: (1) Clark's ESA was a reasonable accommodation under existing law, (2) the law should be changed, and (3) the landlord in any event should be exonerated under the reasoning of the district court because it followed existing law as provided to it by ICRC staff. Appellee Clark argues only one point: the ESA was a reasonable accommodation.

Thus, two issues are clearly before this court: (1) whether the ESA was a reasonable accommodation and (2) whether the landlord had a good-faith defense because it followed telephonic ICRC staff advice. Both appellees presented vigorous written and oral advocacy in support of their respective grounds for affirmance. The public can verify this by examining the respective briefs filed by the appellees and watching the oral argument, which are all available online. There is no rule of appellate procedure that grounds for affirmance have to be argued by all appellees in order to be

considered. No one has suggested before today that both issues are not properly before this court.

**B. Reasonable Accommodation.** This is a case of first impression that requires us to decide whether 2800-1 LLC was reasonable in accommodating Clark's ESA request by waiving its no-pets provision to allow for Clark's ESA on the premises even though doing so adversely affected Cohen's health. 2800-1 LLC accepted liability for breach of the express no-pets provision, but it maintains "it had no choice but to allow the [ESA] into the building and also try to accommodate Cohen's allergies" after consulting with the ICRC about the issue. Clark contends 2800-1 LLC's waiver of the no-pets provision and other actions constitute a reasonable accommodation while Cohen argues these actions were not reasonable given the burdens they imposed on her ability to enjoy living in her apartment. Like the lower courts in this case, all of the parties emphasize to us the problematic uncertainty of the law governing reasonable accommodations for an ESA when the ESA causes a direct threat to another tenant's health and ask for our guidance.

The ICRA's housing provision is nearly identical to the Federal Fair Housing Act (FHA), *compare* Iowa Code section 216.8A(3)(*c*)(2), *with* 42 U.S.C. § 3604(f)(3)(B) (2018), so cases interpreting the FHA may be instructive in our interpretation of the Iowa Act. *See Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 15–17 (Iowa 2010).[4] Some federal law, such as the Americans with Disabilities Act (ADA), treats ESAs differently from service animals and requires state and local programs to accommodate

---

[4]There is no allegation in this case that the apartment building is covered by the FHA, which is limited to federally subsidized housing. Only the ICRA has been raised as a defense. Thus, the FHA is not at issue in this case, and any arguments about our violating "the letter" or "the spirit" or the "the public policy" of the FHA are off the mark. The only relevance of the FHA here is as a persuasive model in interpreting the ICRA.

service animals, but not ESAs. *See* 28 C.F.R. §§ 35.104, 36.104 (2019). The ICRA and the FHA distinguish between service animals, which require specific training, and ESAs, while recognizing the validity of both.[5] *See* Iowa Code § 216.8B(1)(*a*)–(*b*) (2020); U.S. Dep't of Hous. & Urban Dev., FHEO-2020-01, *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act* 5–7 (Jan. 28, 2020) [hereinafter HUD FHEO-2020-01 Notice], https://www.hud.gov/sites/ dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf [https://perma.cc/CC29-BCHY]; *see also* U.S. Dep't of Hous. & Urban Dev., FHEO-2013-01, *Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs* 2 n.4 (Apr. 25, 2013), https://archives.hud.gov/news/2013/servanimals_ntcfheo2013-01.pdf [https://perma.cc/AKA3-2425].

Under Iowa Code section 216.8A(3)(*b*) (2017) of the ICRA, it is unlawful to "discriminate against another person in the terms, conditions, or privileges of . . . rental of a dwelling" because of that person's disability. Reading on, Iowa Code section 216.8A(3)(*c*)(2) states, "a refusal to make reasonable accommodations in rules, policies, practices, or services, when the accommodations are necessary to afford the person equal opportunity to use and enjoy a dwelling" constitutes unlawful discrimination. The statute also provides landlords with a safe harbor in refusing a tenant's requested accommodation if the tenancy "*would constitute a direct threat to the health or safety of other persons* or . . . would result in substantial

---

[5]In 2019, 2019 Iowa Acts chapter 65 was enacted into law. In relevant part, this legislation clarifies that ESAs can be reasonable accommodations. 2019 Iowa Acts ch. 65, § 2 (codified at Iowa Code § 216.8B (2020)). It also criminalized various acts related to an ESA or service animal, including knowingly denying or interfering with the right of a person to have such an accommodation and intentionally misrepresenting an animal as a service animal or service-animal-in-training. *Id.* § 5 (codified at Iowa Code § 216C.11 (2020)). While these provisions do not apply to this case, they also would not have affected our analysis in this opinion.

physical damage to the property of others." *Id.* § 216.8A(3)(*e*) (emphasis added).

Two situations should be distinguished: (1) where the tenancy per se allegedly constitutes a direct threat and (2) where *the accommodation requested by the tenant* allegedly constitutes a direct threat. In the second situation, which is what we have here, the direct-threat analysis and the reasonable accommodation analysis are simply two sides of the same coin.[6]

Under state and federal law, the landlord should generally grant a reasonable accommodation request for an ESA if the person requesting the accommodation has a disability and a disability-related need for the ESA. *See* Iowa Code §§ 216.8B–.8C (2020); HUD FHEO-2020-01 Notice at 6–12; *see also* Iowa Code § 216.8A(2) (2017). However, like the ICRA, the FHA includes situations in which the landlord need not grant a reasonable accommodation request. As the United States Department of Housing and Urban Development's guidelines on the FHA explain,

> A housing provider may, therefore, refuse a reasonable accommodation for an assistance animal if the specific animal poses a direct threat that cannot be eliminated or reduced to an acceptable level through actions the individual takes to maintain or control the animal (e.g., keeping the animal in a secure enclosure).

---

[6]An example of the first situation would be *Arnold Murray Construction, LLC v. Hicks*, where a tenant who was disabled due to a brain injury repeatedly engaged in abusive and threatening behavior toward other tenants. 621 N.W.2d 171, 173 (S.D. 2001). There, no reasonable accommodation would have eliminated the tenant's direct threat. *Id.* at 176. In this case, however, any potential direct threat arises only from the accommodation. Therefore, the two legal issues of reasonable accommodation and direct threat merge into one another. The value of considering "direct threat" here is simply to help identify accommodations that would not be "reasonable."

Another example of the first situation would be *Hunt v. Aimco Properties, L.P.*, which involved a tenant who was allegedly aggressive, confrontational, harassing, belligerent, and threatening. 814 F.3d 1213, 1219 (11th Cir. 2016). The court indicated that direct threat in those circumstances would be an affirmative defense of the landlord. *Id.* at 1225. Again, that makes sense, because direct threat is being played as a trump card that sidesteps any need to address reasonable accommodation. Not so here.

HUD FHEO-2020-01 Notice at 13–14. Thus, both state and federal law allow for the consideration of the accommodation's effects on third parties in the reasonable accommodation determination, though neither explains how to consider these effects in practice.

Here, all parties agree that Clark has a psychological disability that substantially limits one or more major life activities and that a landlord must generally make reasonable accommodations for persons like Clark with disabilities under state and federal law. They also agree that Cohen suffers from allergies to animals, and Clark's dog caused her to have allergic attacks. Nevertheless, they differ in their views as to how the landlord should have handled Clark's request for a reasonable accommodation given the direct threat his ESA posed to Cohen's health.

While sympathetic to Cohen's allergies, Clark contends the balance should weigh heavily in favor of approving ESA accommodation requests despite the ill effects of the ESA on other tenants. He also argues that the accommodation in this case was reasonable because 2800-1 LLC did all it could to mitigate Cohen's allergic reactions to the ESA without incurring an undue financial burden. Under Cohen's balancing of the circumstances, she argues 2800-1 LLC should have rejected Clark's request for an ESA because of the direct threat the ESA presented to her health and the substantial hardship the ESA's presence caused her on a daily basis. She also notes 2800-1 LLC's accommodation in this case was not reasonable because it could have offered Clark a unit in another building that already allowed pets, as the leasing manager testified that 2800-1 LLC had vacant units available in other buildings that allowed pets. Alternatively, Cohen presents a priority-in-time test analogous to our nuisance law in which the tenant who signed the lease first has priority

over the tenant who signed the lease second, moved into the building, then sought to change the lease after signing it.

Meanwhile, 2800-1 LLC reiterates that its waiver of the no-pets provision to allow Clark's ESA on the premises was a reasonable accommodation that it had no choice but to grant and asks us to provide clear guidance on how to resolve these situations going forward. 2800-1 LLC stresses the problems associated with both tenants' attempts to establish a balancing test in cases like this because every landlord is different and "a balancing test leaves landlords and tenants without real guidance as to how to act." As 2800-1 LLC opined, "[I]t couldn't act without denying or interfering with the rights of one of the two tenants." Though it disagrees with Cohen's balancing test proposal, 2800-1 LLC did argue for a similar bright-line priority-in-time test before the district court in which "an [ESA] is not a reasonable accommodation where another tenant in the building provides credible evidence that they are allergic to the sort of animal proposed."

Frankly, it's clear that Cohen and Clark cannot satisfactorily coexist in the same apartment building. For Cohen, living in the same building as Clark's ESA left her, at best, in a state of constant misery due to the allergic reactions she suffered from the ESA's presence. Meanwhile, Clark's mental health would suffer if he could not live in the apartment building without his ESA. Either way, one of the tenants would suffer negative health consequences if required to coexist in the same building with or without the ESA.

There is no law in Iowa or any other jurisdiction that clearly establishes how landlords should handle reasonable accommodation questions with ESAs. Generally speaking, determining whether a situation presents a reasonable accommodation involves "a highly fact-

specific inquiry and requires balancing the needs of both parties." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006) (en banc) (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)); *see also Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541–42 (6th Cir. 2014).

Both Cohen and Clark have a right to the enjoyment of their apartment premises. The right to physical well-being does not trump the right to mental well-being and vice versa. We hold that other tenants' rights are properly considered in the balancing of needs in the reasonable accommodation analysis. *See Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1046 (6th Cir. 2001) (holding that a landlord's contractual duties to other tenants were a permissible consideration in its reasonable accommodation analysis concerning a disabled tenant). Where the physical or mental well-being of tenants collide, we agree with Cohen that a priority-in-time test should be applied as a factor in the reasonableness analysis. As the well-known maxim goes, "first in time shall be first in right." *Inter-Ocean Reins. v. Dickey*, 222 Iowa 995, 998, 270 N.W. 29, 30 (1936). Nevertheless, we emphasize that priority in time is but one consideration of many in this balancing test rather than the dispositive factor in concluding whether an accommodation was reasonable.

This priority-in-time consideration is analogous to the one used in seniority systems under the ADA, as the United States Supreme Court has held that it is not a reasonable accommodation for an employee with a disability to leapfrog a more senior employee's right to a position under a bona fide seniority plan. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 405–06, 122 S. Ct. 1516, 1525 (2002). Other courts have similarly held that an employer's obligation to provide reasonable accommodations to disabled employees does not require the employer "to provide an

accommodation that is inconsistent with the contractual rights of other workers." *Fiumara v. President & Fellows of Harvard Coll.*, 526 F. Supp. 2d 150, 157 (D. Mass. 2007); *see also Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001) (holding an employer need not "bump another employee from a position in order to accommodate a disabled employee"); *Laurin v. Providence Hosp.*, 150 F.3d 52, 60 (1st Cir. 1998) (finding it was not a reasonable accommodation under the ADA to excuse the plaintiff, a disabled nurse, from her shift rotation when the collective bargaining agreement only waived the shift rotation requirement for nurses at a certain seniority level).  Generally, when an employer cannot satisfy both employees, and a seniority system is in place, the employee who has been there longer prevails over the less senior employee requesting a disability accommodation.  *See US Airways, Inc.*, 535 U.S. at 405–06, 122 S. Ct. at 1525.

The Supreme Court's decision did not turn on the employer being contractually obligated to honor the seniority system.  Indeed, it was observed that the employer had the unilateral right to change the seniority system at any time and it was "*not* intended to be a contract."  *Id.* at 410, 122 S. Ct. at 1527 (O'Connor, J., concurring); *see also id.* at 423, 122 S. Ct. at 1534 (Souter, J., dissenting).  It was enough for the Supreme Court majority that "expectations" of other employees would be undermined.  *Id.* at 404 (majority opinion).  Similarly, here, we believe a tenant who cannot tolerate the presence of dogs or cats for medical reasons and who rents an apartment in a pet-free building with a no-pets policy has a reasonable expectation that this circumstance will continue.

In this fact-specific inquiry, being first in time tips the balance in Cohen's favor.  Cohen signed her lease first.  Approximately seven months after signing her lease and one month after Cohen moved into her

apartment and Clark into his, Clark sought to waive the no-pets provision of the lease to accommodate his ESA. Cohen relied upon the express no-pets provision in the lease and 2800-1 LLC's advertisement that the building was a no-pets building. Cohen's acknowledgement in the contract that "[r]easonable accommodations [are] accepted" simply states that the landlord will follow the law, something the landlord is obligated to do anyway.

Clark signed his lease after Cohen, knew the building prohibited pets, and did not request a waiver of the no-pets provision until after his and Cohen's leases began. If their positions were reversed, and Clark had signed the lease first and subsequently sought a waiver of the no-pets provision of the lease as a reasonable accommodation for his ESA after both parties moved into their apartments, he might be the one advocating for us to consider his priority in time.

Our holding today aligns with those of other courts that have rejected requested changes to a residential complex's contract when those changes interfere with the rights of third parties. *See, e.g.*, *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 492 (6th Cir. 2019) (holding a tenant's request to ban smoking in the condominium complex where she resided to ease her asthma symptoms was not a reasonable accommodation because the smoking ban fundamentally altered the complex's smoking policy that "would intrude on the rights of third parties"), *petition for cert. filed*, No. 19–1249 (U.S. Apr. 27, 2020). For example, the United States Court of Appeals for the Sixth Circuit rejected a tenant's request to force his neighbor out of the apartment complex in violation of the neighbor's lease when the neighbor had issues with the tenant's mental-illness-induced screaming and door slamming at all hours of the night. *Groner*, 250 F.3d at 1046–47. Likewise, in the employment context, the United

States District Court for the Eastern District of Virginia held that an employer did not engage in disability discrimination by refusing to allow the plaintiff to bring her emotional support dog to work in part due to her coworkers' dog allergies. *Maubach v. City of Fairfax*, No. 1:17–cv–921, 2018 WL 2018552, at *6 (E.D. Va. Apr. 30, 2018); *see also Roe v. Providence Health Sys.-Or.*, 655 F. Supp. 2d 1164, 1167–68 (D. Or. 2009) (concluding a hospital did not unlawfully discriminate against the defendant in violation of the ADA when it denied a patient the use of her service dog due to the health risks, including allergies, that the dog created for others in the hospital); *Crossroads Apartments Assocs. v. LeBoo*, 578 N.Y.S.2d 1004, 1007 (City Ct. 1991) (finding whether an emotional support cat was a reasonable accommodation based on, among other things, the property manager's affidavit that the cat "would create health problems for other tenants" to be an issue of fact).

Further, the Fourth Circuit Court of Appeals has held that the potential for personal injury to third parties is a relevant factor in determining whether a person or entity violated the federal fair housing law by rejecting a reasonable accommodation request. *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272–73 (4th Cir. 2013). In the workers compensation context, we have previously concluded that an allergic reaction can constitute an "injury." *St. Luke's Hosp. v. Gray*, 604 N.W.2d 646, 652 (Iowa 2000). Thus, the potential allergic reactions of other tenants to an ESA are a relevant factor in determining whether to grant a tenant's accommodation request for the ESA. Ultimately, the rights of third parties "[do] not have to be sacrificed on the altar of reasonable accommodation." *Davis*, 945 F.3d at 492 (alteration in original) (quoting *Groner*, 250 F.3d at 1046).

We reject Clark's argument that considering priority in time "is fraught with potential abuses" because

> [l]andlords, hoping to keep their buildings animal free, could easily find a tenant who objected to an animal in the building and frame it as 'credible reason' for denying another tenant's emotional support animal or as an excuse not to search for other accommodations to less[e]n the effects on other tenants.

This is not a situation in which Cohen simply objected to the ESA's presence. Nor would a tenant's objection to an ESA alone be sufficient to deny a tenant's valid request for an ESA accommodation. Landlords need to explore the ability to grant the accommodation request in good faith before rejecting it. *See Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1125 (D.C. 2005) ("[T]he landlord must attempt accommodation at least by opening a dialogue with the tenant on the requested accommodation and thus explore accommodation in good faith before saying 'no.' ").

When the leasing manager contacted the residents about Clark's ESA request, Cohen responded by detailing her allergies and symptoms to cats and dogs. The severity of her allergies was medically documented, and she even went to an allergist to be retested when her symptoms started to increase after Clark's ESA moved into the building. The record shows it was easier for the leasing manager to have his own dog certified as an ESA without medical documentation in a matter of minutes online than it was for Cohen to go through allergy testing and receive medical documentation of her pet allergies. In any event, landlords should only consider this priority-in-time factor in its balancing when the tenant objecting to the accommodation has priority in time and can provide medical documentation supporting the tenant's objection, as Cohen did in this case.

Our holding results from the fact-specific balancing the law requires us to undertake in reasonable accommodation determinations. We are *not* holding that a visually disabled person with a service dog should be denied access to a "no pets" apartment building whenever a tenant with dog allergies is already living in that building and would suffer allergy attacks from the presence of the dog. That situation is not before us today. That both service animals and ESAs are types of reasonable accommodations under both the ICRA and the FHA does not mean, however, that the balancing test we describe in this opinion will necessarily end up with the same result when the animal is a service animal. For example, once a service animal has learned an apartment and an apartment building, there is a burden on requiring the tenant and the service animal to relocate to another apartment or building that might not exist for an ESA.

Also, in this case, the tenant asked to bring the ESA onto the premises approximately one month after his tenancy began. It appears the tenant could have been provided an apartment in a different building that did not have a "no pets" policy or that already had one or more ESAs.[7] Indeed, if the tenant had broached the ESA with the landlord before moving in, the parties might have adopted this solution and this litigation might not have arisen.

Notably, other courts have indicated that it is a reasonable accommodation for a landlord to offer a tenant an apartment in another building when the tenant's need for an accommodation conflicts with the rights of another tenant. *See Groner*, 250 F.3d at 1046 (considering tenant's proposed accommodation of moving to another apartment within

---

[7]Jeffrey Clark, the leasing and property manager for 2800-1 LLC, testified to having received thirty-two ESA requests in the past year, all of which were granted. Jeffrey also testified that he had apartments in other buildings available that would allow pets but had been advised by the ICRC staff that having a tenant move to a different apartment building did not constitute a reasonable accommodation.

the same complex but ultimately rejecting this accommodation because all apartments in the complex had the same configuration that caused tenant's issue and would not alleviate the issue); *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 263 (S.D.N.Y. 2014) ("In his submissions, Plaintiff did not provide any reason why he rejected THA's offers of the apartment at 4 Union Place. However, in his deposition, Plaintiff cited two reasons for these rejections. The first was his 'comfort level' with 31 Midland Place, 'the building that [he had] been in for close to 30 years.' While Plaintiff's attachment to his building is understandable, it has no demonstrated relationship to his handicap or disability, and as such, THA had no obligation to take it into account in attempting to accommodate him." (alteration in original) (citation omitted)).

**C. The Landlord's Good-Faith Defense.** Finally, we need to consider 2800-1 LLC's argument that even if the ESA was not a reasonable accommodation, it should have a good-faith defense to a breach of contract claim. This was essentially the view of the district court, which dismissed Cohen's claim after noting that the Landlord

> did consult with the Iowa Civil Rights Commission and acted on their advice. . . . Landlord did not believe [it] had the option to decline the request and [it] made every effort to mitigate the effect of that result on Ms. Cohen.

Although we are sympathetic to the landlord's predicament, Cohen observes correctly that the district court cited no supporting law for its ruling. Nor does the landlord cite any law in defending the district court's ruling before our court. Generally, contractual liability is strict liability. A breach is a breach, whether committed in good faith or not. *See* Restatement (Second) of Contracts § 235(2), at 211 (Am. Law Inst. 1981) ("When performance of a duty under a contract is due any non-performance is a breach."); *id.* § 235 cmt. *b*, at 212 ("When performance is

due, . . . anything short of full performance is a breach, even if the party who does not fully perform was not at fault . . . ."). The situation is typically binary: either (1) a party breached the contract, giving rise to an action for damages and discharging the other party's performance if the breach was material or (2) the party didn't breach, in which case the other party remains bound to the contract and has no claim for damages. So, under contract law, the alternatives are to find that Cohen is bound to continue leasing her apartment and has no remedy or to find that she can claim damages against 2800-1 LLC because it breached its "no pets" covenant as to her.

Also, no one argues that the informal telephonic advice 2800-1 LLC received from the ICRC is binding as to what the law is. *See* Arthur Earl Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L. Rev. 731, 810 (1975) ("Informal advice from an agency—an advisory opinion—is not normally deemed binding upon an agency because of its very lack of formality and the unstructured nature of that advice. If informal advice given by an employee of an agency were normally deemed binding upon it, no end of injury to the public interest would be possible."). In division III.B, we have determined what the law required the landlord to do in this case. Hence, this is not a case where compliance with a government regulation or order would relieve 2800-1 LLC from performance. *See* Restatement (Second) of Contracts § 264 (explaining that nonperformance of a duty is "a basic assumption on which the contract was made" when "the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order").

Under contract law, given the terms of this lease, Cohen must prevail. The landlord breached its promise to her that her apartment would have no pets other than "reasonable accommodations," and we have found that Clark's ESA was not a reasonable accommodation. The issue here is whether an ESA that is not a reasonable accommodation breaches a "no pets" clause in a lease. Clearly, it does. Additionally, Cohen's suffering from her allergies constitutes a breach of her covenant of quiet enjoyment.

We recognize that Cohen's lease is a residential lease governed by Iowa Code chapter 562A, the Iowa Uniform Residential Landlord Tenant Act (IURLTA).

Iowa Code section 562A.21(2) of the IURLTA states,

> Except as provided in this chapter, the tenant may recover damages and obtain injunctive relief for any noncompliance by the landlord with the rental agreement or section 562A.15 unless the landlord demonstrates affirmatively that the landlord has exercised due diligence and effort to remedy any noncompliance, and that any failure by the landlord to remedy any noncompliance was due to circumstances reasonably beyond the control of the landlord.

Thus, the IURLTA gives the landlord a defense to a breach of lease claim if the landlord "exercised due diligence and effort to remedy any noncompliance" and "any failure by the landlord to remedy any noncompliance was due to circumstances beyond the control of the landlord." *Id.* But here the landlord did not raise section 562A.21, and only if it had would we need to decide whether the landlord had met the prerequisites set forth in subsection (2) of that section. We must conclude therefore that the landlord waived this defense and Cohen must prevail on her claims.

In summary, substantial evidence supports the district court's factual finding that 2800-1 LLC's efforts justified denying Clark's ESA in

the apartment building given the inability to accommodate Cohen's allergies with the ESA's presence. 2800-1 LLC's waiver of the no-pets provision in Clark's lease and its attempts to accommodate both Clark and Cohen while they lived in the same building was not a reasonable accommodation. This is especially so when 2800-1 LLC had available apartments for Clark in other buildings that already allowed pets and considering Cohen's priority in time. 2800-1 LLC should have denied Clark's request to accommodate an ESA in the same apartment building as Cohen. The district court, having reached this same conclusion, erred in dismissing Cohen's claims for breach of contract. We reverse and remand for an award of Cohen's requested damages of one month's rent.

**IV. Conclusion.**

For the aforementioned reasons, we reverse the district court's dismissal of Cohen's case and remand to the district court.

**REVERSED AND REMANDED.**

Waterman, Mansfield, and McDermott, JJ., join this opinion. Appel, J., files a dissenting opinion. McDonald, J., files a separate dissenting opinion in which Oxley, J., joins.

**APPEL, Justice (dissenting).**

In this case, Cohen brings common law contract and quiet enjoyment claims against landlord 2800-1 LLC arising from the landlord's decision to accommodate Clark by allowing him to have a support animal on the premises, notwithstanding a provision in the lease which provided that no pets were allowed, but added the qualifier that "[r]easonable accommodations [are] accepted."[8]

If the landlord's action permitting Clark to have the support animal was a reasonable accommodation under the lease, the landlord prevails. In determining the meaning of this contractual term, the parties invite us to look to state and federal antidiscrimination law.

**I. Preliminary Issue: Was Discretionary Review Improvidently Granted?**

I fully agree with division II of Justice McDonald's opinion regarding the state of the advocacy in this case. In its brief, the landlord states that under the United States Department of Housing & Urban Development, FHEO-2013-01, *Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs* 3 (Apr. 25, 2013), https://archives.hud.gov/news/2013/servanimals_ntcfheo2013-01.pdf [https://perma.cc/AKA3-2425], and *Bronk v. Ineichen*, 54 F.3d 425, 431 (7th Cir. 1995), an emotional support animal (ESA) is "essentially, a per se accommodation." The landlord further states, "Under the framework the

---

[8]This is not a case where a third party is being asked to surrender contract rights in order to accommodate a person with disability. *See, e.g.*, *Fiumara v. President & Fellows of Harvard Coll.*, 526 F. Supp. 2d 150, 157 (D. Mass. 2007). The question is not whether reasonable accommodation requires defeat of third-party contract rights. This case involves the contract right itself. The landlord expressly reserved the ability to engage in "reasonable accommodation."

Landlord had, Clark's dog was a reasonable accommodation under the ICRA."

Then, however, the landlord somersaults and argues that "[t]he current rule that animals are essentially per se reasonable accommodations is clearly wrong." According to the landlord,

> Continuing with such a rule inevitably leaves those persons who are allergic to certain animals with nowhere to live without suffering the effects of their allergies, and requires landlords to incur substantial costs, depending on how well the owners of the animals care for them and how well-housetrained those animals are. The costs can far exceed the maximum deposit of two-months rent a landlord can require for a single apartment.

Thus, although the landlord complied with "the current rule," the landlord, like the plaintiff, advocates abandoning it. According to the landlord, "landlords who wish to market their buildings and units to people with allergies and people who don't want to live with animals should be able to do so without the requirement that the promises they've made will be broken."

In other words, the landlord in this case urges us to adopt the approach favored by the plaintiff, and merely restates "the current rule" in a conclusory manner. The plaintiff and the landlord are joining forces to seek to persuade this court to adopt an approach to reasonable accommodation contrary to the advice received by the landlord from the Iowa Civil Rights Commission (ICRC).

Has the issue of the proper approach to reasonable accommodation truly been joined in this case? Or, do we have two friendly parties seeking to encourage this court to adopt a different framework? Ordinarily, we are not in the business of providing advisory opinions on issues for which there is no real adversarial context. *See, e.g., Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 711–12 (Iowa 2016) (finding the issue not decided where

no full adversary briefing); *State ex rel. Turner v. Midwest Dev. Corp.*, 210 N.W.2d 525, 525 (Iowa 1973) ("[I]ssues presented in a case on appeal become moot if an opinion thereon would be of no force or effect as to the underlying controversy."). Where an issue is not contested by the parties, the court's subsequent holding is not the product of an adversarial proceeding and is not entitled to stare decisis. *See Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 614–15 (Iowa 2017) (Appel, J., concurring specially).

The landlord's lack of interest in defending its actions is demonstrated by the contrast between the landlord's brief and Justice McDonald's opinion. Justice McDonald raises a host of issues, in depth, but the landlord did not argue them. Indeed, the landlord either did not mention them or sought to abandon them. It seems that the landlord largely sides with the tenant, Cohen, on the basic issue underlying this case but suggests that it was relying upon the advice of the ICRC in responding to Cohen.

There are additional important issues that the landlord does not raise because of the landlord's desire to have the court adopt the approach of Cohen, its purported adversary. For example, there is a potential question of whether the emotional support animal is a "pet" under the contract. An argument may be made that an ESA should not be considered a "pet" under the lease because such an animal is not a pet under the Federal Fair Housing Act. *See Baird v. 1600 Church Rd. Condo. Ass'n*, No. CV 17–4792, 2017 WL 5570333, at *5 (E.D. Pa. Nov. 17, 2017) (finding that if a plaintiff meets the burden for a service animal or ESA, pursuant to HUD guidance, landlords must make allowance for exception to a no-pets policy); U.S. Dep't of Hous. & Urban Dev., FHEO-2020-01, *Assessing a Person's Request to Have an Animal as a Reasonable*

*Accommodation Under the Fair Housing Act* 3 (Jan. 28, 2020), https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf [https://perma.cc/CC29-BCHY] ("Assistance animals are not pets."). But this argument would cut against the landlord's desire that this court adopt the plaintiff's approach to reasonable accommodation. Even though the court has found a violation of the no-pets policy because the landlord's action was not an accommodation, the court correctly does not address the question of whether an ESA may be considered a pet under the FHA, as this question was not raised by any party. As a result, the issue remains open and is not decided in this case.

The only defense that the landlord really raises in this case on appeal is near the end of its appellate brief.[9] The district court had stated that "the Court would find that the efforts made by Landlord were sufficient to justify denying Mr. Clark's request for reasonable accommodation or moving to the imperfect solution of asking him to move to another apartment building." That looks like a ruling against the landlord. The district court, however, noted that the law "was not clear" at the time of events and that the landlord "did consult with the Iowa Civil Rights Commission and acted on their advice." The district court further stated that "under the law as it was, Landlord did not believe [it] had the option to decline the request and [it] made every effort to mitigate the effect of that result on Ms. Cohen." As a result, the district court held that "[t]he claims against both Defendants should be dismissed."

---

[9]Before the small claims court, the landlord's attorney did not provide opening or closing argument. The landlord's attorney did call Jeffrey Clark (no relationship to plaintiff), a manager of the apartment complex. Through Jeffrey Clark's testimony, the landlord attempted to show pets imposed substantial costs on landlords. Further, the landlord offered evidence to show that requests for ESAs were increasing in recent years. Finally, the landlord showed that Jeffrey Clark called the ICRC and received the advice of ICRC staff on the issue.

The landlord on appeal seeks affirmance of the district court's opinion on the ground expressed by the district court. According to the landlord,

> Though the Landlord admitted it had breached the "no-pets" provision of Cohen's lease, the District Court found that the breach was acceptable because of the state of the law requiring the Landlord to accommodate Clark's animal. The Court's dismissal should be affirmed.

Plaintiff Cohen contests the rationale that the breach was essentially excused because of the state of the law and the landlord's reliance on the advice of the ICRC. The excuse issue is thus presented in an adversarial setting and is properly before the court. But it is the only issue contested by the landlord and Cohen on this appeal.

Further, there are additional features that suggest this might not be the best case to decide important issues. Although Cohen claims on appeal that the ESA created a direct and substantial threat to her health and safety, she remained in her apartment throughout the term of her lease and then sued the landlord for only one month's back rent, a rather modest remedy. Given the briefing in this case, it seems to me the landlord would be happy to pay Cohen one month's rent to get a ruling declaring that the landlord has no obligation to accommodate persons who have demonstrated a need for an ESA. The landlord seeks to improve its overall position in this litigation through vindication of the substantive legal position of Cohen, the landlord's purported adversary.

It is true, however, that Clark presents a more robust brief on a number of issues than does the landlord. But Cohen waived her claim against Clark. Because Cohen no longer has a claim against Clark, Clark's arguments cannot be imputed to the landlord in this case.

In addition to the limited development of legal issues, the record in this case leaves a lot to be desired. A two-page stipulation contains many vague statements, including, for instance, that Cohen suffered from allergy attacks, but does not describe them. The transcript at the hearing is only slightly more than a hundred pages and contains many loose ends. Cohen testified she feared that her dog allergies would progressively become as severe as her allergies to cats because of the presence of Clark's ESA, but we have no expert testimony on whether this concern was scientifically supported or was simply Cohen's fear. Among other loose ends, as will be described below, we do not know whether a reshuffling of apartment locations would have successfully accommodated both Clark and Cohen.

And, there is a further complication in the posture of this case. The Iowa legislature recently enacted Iowa Code section 216.8B. 2019 Iowa Acts ch. 65, § 2 (codified at Iowa Code § 216.8B (2020)). Iowa Code section 216.8B(2) (2020) provides that "[a] landlord shall waive lease restrictions and additional payments normally required for pets on the keeping of animals for the assistance animal or service animal of a person with a disability." The waiver requirement of Iowa Code section 216.8B(2) is expressed in mandatory terms and does not contain any express qualifications. The new statute further provides for criminal liability for a person "who knowingly denies or interferes with the right of a person with a disability under this section." Iowa Code § 216.8B(4).

The parties agree that these new statutory provisions do not apply to this case. A fair case can be made that the new statute establishes a per se approach because it contains an unqualified requirement for a landlord to waive lease restrictions for ESAs. Has the majority laid the foundation for invalidating the Iowa statute on the ground that federal antidiscrimination law rejects a per se rule? Should we not await a case

where the question of the validity of the state statute is directly raised and fully developed by the parties?

In my view, because of the posture of this case and the limited advocacy and record in this case, I would dismiss the discretionary appeal as improvidently granted. The case is characterized as an "issue of first impression," and so it is. It also may provide the analytic basis to invalidate a provision of Iowa law. We should have the best advocacy before we decide such important questions. The limited nature of the advocacy does not provide a good vehicle for the court to decide the fundamental issues before it.

**II. Overview of Issues.**

**A. Reasonable Accommodation Under the Contract.**

1. *Introduction.* As indicated above, the landlord did not analyze in its appellate brief what a reasonable accommodation is under applicable law. The gist of the landlord's brief in this case was that the accommodation made for the ESA was *not* reasonable.

Ordinarily, determination of the question of reasonable accommodation involves two elements: reasonableness and necessity. *Hollis v. Chestnut Bend Homeowners Ass'n,* 760 F.3d 531, 541 (6th Cir. 2014). In this case, the parties stipulated that Clark has an impairment that limits one or more major life activities and that the ESA is necessary to afford him equal opportunity to use and enjoy his tenancy. But the parties did not stipulate on the issue of reasonableness. An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it. *See Oconomowoc Residential Programs v. City of Milwaukee,* 300 F.3d 775, 784 (7th Cir. 2002).

2. *Exception to a no-pets policy for an ESA may be a reasonable accommodation that does not fundamentally change the landlord–tenant relationship.* Although not argued by the landlord, there is ample authority for the proposition that the use of an ESA in a tenant's housing *may* be a reasonable accommodation. *See, e.g., Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 110 (3d Cir. 2017); *Bronk*, 54 F.3d at 429; *Warren v. Delvista Towers Condo. Ass'n*, 49 F. Supp. 3d 1082, 1087 (S.D. Fla. 2014). There may be a question, however, in some cases as to whether the granting of an exception to a landlord's general no-pets policy works a fundamental change in the rental agreement and thus is not a reasonable accommodation. Where a landlord, pursuant to a contract that permits reasonable accommodations to a no-pet rule, allows an ESA accommodation, I do not think the landlord's effort to apply the reasonable accommodation exception amounts to a fundamental change of the nature of the complex. *See Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 492 (6th Cir. 2019) (finding that a one-off adjustment to a policy is not a complete change), *petition for cert. filed*, No. 19–1249 (U.S. Apr. 27, 2020).

3. *Consideration of third-party health as part of reasonable accommodation analysis.* In this case, a critical potential issue is to what extent the interests of a third party, Cohen, may be considered in determining whether the accommodation for Clark is reasonable. Is the impact on other tenants properly considered in making that determination? Or alternatively, is the question of reasonable accommodation merely a balancing of rights between the landlord and the tenant, with the landlord having discretion to refuse a reasonable accommodation only when they choose to assert the affirmative defense of a direct and substantial threat to the health and safety of third parties? The landlord did not address this issue in its briefing.

The majority opinion states that "both state and federal law allow for the consideration of the accommodation's effects on third parties in the reasonable accommodation determination." That is certainly true where the landlord invokes the affirmative defense of direct and substantial threat to the health and safety of a third party through specific refusal of an otherwise reasonable accommodation. *See Talley v. Lane*, 13 F.3d 1031, 1034 (7th Cir. 1994).

But that did not happen in this case. The direct and substantial threat provision is a safe harbor available to a landlord in which no balancing occurs, unlike the reasonable accommodation question. It is a categorical refuge available where accommodations have been denied.

Here, however, the question is whether an accommodation that has been granted was reasonable and therefore did not amount to a breach of contract or breach of quiet enjoyment. The question becomes whether in making the reasonable accommodation determination, the landlord is required to consider the health impact on third parties or only the impact on the landlord and the person seeking the reasonable accommodation.

There is little caselaw on this particular issue. There are many cases approving of waivers of no-pet provisions in a landlord–tenant agreement as reasonable accommodations, as cited by Justice McDonald. Most of those cases, however, did not involve health concerns of third parties.

In one case cited by Justice McDonald, the court did at least tangentially consider whether the health of third parties is to be properly considered by the landlord in making a reasonable accommodation determination. In *Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798 (E.D. Cal. 2016), the landlord permitted the plaintiff to have a cat in the apartment. *Id.* at 802. There were concerns raised about fleas and the safety of residents, but the district court ruled that no triable issue

was present. *Id.* at 807–08. Any determination on the issue "must be based on an individualized assessment of the specific animal's actual conduct." *Id.* at 808. Where the opponents of the accommodation offered only generalized concerns, summary judgment on the issue was appropriate. *Id.* This case, however, does not hold that health implications to third parties must be considered. A case cited by the majority indicates that the reasonability determination must consider the burden that the requested modification would impose on the defendant and, in parenthesis, "and perhaps on persons or interests whom the defendant represents." *Hollis*, 760 F.3d at 541–42. The term "perhaps" is not very strong. But in *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039 (6th Cir. 2001), the United States Court of Appeals for the Sixth Circuit considered the impact of a proposed accommodation on other tenants. There, Groner, a person with mental disabilities who slammed doors and screamed, proposed that the complaining tenant be moved to another apartment within the apartment complex. *Id.* at 1041–43, 1045–46. The Sixth Circuit rejected that proposal, noting that the impact on Groner's new neighboring tenant would be unacceptable. *Id.* at 1046.

On balance, I think the term "reasonable accommodation" as used in the lease is open-ended. It is a phrase of inclusion, not exclusion. Thus, I conclude that when making a determination of reasonable accommodation, the landlord should consider all relevant interests, including the potential health on third parties. Such a contractual term should not be construed to permit the landlord to completely ignore health concerns of other renters. Even if health considerations are insufficient to amount to a direct and substantial threat, the landlord should consider lesser health threats as part of the determination of whether an accommodation is reasonable. As colorfully noted in *Groner*, "the

[neighbor's] rights did not have to be sacrificed on the altar of reasonable accommodation." *Id.* at 1046 (alteration in original) (quoting *Temple v. Gunsalus*, No. 95–3175, 1996 WL 536710, at \*2 (6th Cir. Sept. 20, 1996)).

I am thus inclined to disagree with Justice McDonald's view that a request for use of an ESA as an accommodation by a person with a disability should be considered per se reasonable under the lease. If, by way of extreme example, Cohen presented evidence that the presence of Clark's ESA would cause her life-threatening attacks and the necessity of periodic EpiPen usage, I would not require evidence of death to conclude that Clark's accommodation of an ESA dog was not reasonable. Yet, I do not think that the presence of a tenant with a pet allergy necessarily means that a landlord may not accommodate a disabled person in need of an ESA. In many cases, the marginal allergy interest may be overwhelmed by the pressing necessity shown by the disabled person.

4. *"First in time" as a factor in reasonability analysis.* An "under all the circumstances" application of the concept of reasonable accommodation is the antithesis of a bright-line rule, or series of bright-line rules. Some want the law to be only about bright-line rules, but all bright-line rules are necessarily both overly broad and under inclusive. Where nuance and precision is considered important, flexible case-by-case consideration is often preferable. Like the flexible standards in juvenile and family law, the concept of reasonable accommodation is nuanced, highly contextual, and case specific. Some may prefer bright-line rules, but that is not what the lease and antidiscrimination law provide. Nor is it what the parties included in their contract. In their contract, the parties did not utilize a bright-line rule. We cannot rewrite the contract to include one.

The majority opinion asserts that the concept of "first in time" provides the tipping point in this case. I do not think the timing of when one inks a lease is very important. A clear line can similarly be drawn, or rule obtained, by applying an alphabetical approach or some kind of lottery. This is not a race in time, and the fact that a tenant inked up days, weeks, or months prior to a person who seeks accommodation does not, by itself, weigh heavily in the analysis. What might be important, however, is if a landlord rejecting an accommodation could show that other tenants had substantial reliance interests superior to that of the cotenant seeking accommodation.

Here, however, Cohen has shown no substantial reliance interest superior to Clark. Yes, her lease began two months earlier. But as Justice McDonald persuasively shows, Cohen knew from the get go that the pets policy was subject to reasonable accommodations. She may not have fully understood what that meant, but it simply cannot be stated that Cohen had no knowledge that there was a possibility that the no-pets policy could be overridden by reasonable accommodations of other tenants. She had very direct knowledge of that.

Further, this case is not like the collective bargaining cases where seniority rights under a collective bargaining agreement are overridden by assertions of reasonable accommodations. *See Fiumara v. President & Fellows of Harvard Coll.*, 526 F. Supp. 2d 150, 157 (D. Mass. 2007) (finding that failure to grant injured worker a position in circumvention of seniority was not disability discrimination through failure to reasonably accommodate worker); *see also Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1257 (11th Cir. 2011) (ruling that employer was not required to "bump" an employee from their current position to accommodate injured worker). Here, the contract itself provided for reasonable

accommodations. There is no conflict at all between reasonable accommodation under disability law and the terms of Cohen's contract. Indeed, Cohen agreed to a contract with a qualified no-pets provision stating the lease was subject to reasonable accommodations. On this point, I agree with Justice McDonald.

**B. Good-Faith Action in Reliance on Advice from ICRC.** Justice McDonald asserts that the landlord in this case is not liable for damages because of its good-faith reliance on advice received from the ICRC. Ordinarily, we do not embrace the concept that a breaching party may rely on a good-faith escape from contractual liability. In contract law, the party claiming breach is not required to prove lack of good faith on the part of the breaching party. *See, e.g.*, Ricardo Solano Jr., *Contracts—Implied Covenant of Good Faith and Fair Dealing—A Party's Conduct in Performing and Terminating a Contract May Breach the Implied Covenant of Good Faith and Fair Dealing Even if the Termination is Pursuant to an Express and Unambiguous Term in the Contract—Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 690 A.2d 575 (1997),* 28 Seton Hall L. Rev. 720, 725 (1997) ("[A] party's motive for terminating an agreement is irrelevant when considering whether the party violated the contract's express terms."). Many well-lawyered contracts produce unexpected ambiguities that, when fully litigated, could reasonably go either way. But that is not a defense to breach of contract.

But there may be an exception when a party believes it is required to breach its contract because of a government order or regulation. As Justice McDonald points out, section 264 of the Restatement (Second) of Contracts provides that contractual performance may be excused "[i]f the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation." Restatement (Second) of

Contracts § 264, at 331 (Am. Law Inst. 1981). That proposition seems uncontroversial in some contexts. Comment *b* states, however, that,

> It is not necessary that the regulation or order be valid, but a party who seeks to justify his non-performance . . . must have observed the duty of good faith and fair dealing imposed by [section] 205 in attempting, where appropriate, to avoid its application.

*See Directions, Inc. v. New Prince Concrete Constr. Co.*, 491 A.2d 1347, 1349 (N.J. App. Div. 1985) (quoting Restatement (Second) of Contracts § 264 cmt. *b*, at 333). It has been said that a government policy "need not be explicitly mandatory to cause impracticability." *Int'l Minerals & Chem. Corp. v. Llano, Inc.*, 770 F.2d 879, 887 (10th Cir. 1985). For example, in *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 980 (5th Cir. 1976), government jawboning over giving preference to procurements related to the Vietnam War was held to provide a sufficient excuse.

Here, the landlord engaged in highly appropriate but nevertheless informal consultation with the ICRC. There is no suggestion that there was collusion between the ICRC and the landlord. Yet, there was no order from the ICRC, only advice on how to proceed in this case.

Further, in order to support an excuse for nonperformance, the difficulty could not have been contemplated by the parties at the time they made the contract. *See In re David's & Unique Eatery*, 82 B.R. 652, 654 (Bankr. D. Mass. 1987) ("The essence of the defense of impracticability is that the cause for nonperformance must be some extreme or unreasonable difficulty which could not reasonably be expected to be within the contemplation of the parties at the time they made their contract."). Here, the parties incorporated the term "reasonable accommodation" into their lease. They knew or should have known of the difficulty of application of the term and the potential of seeking guidance from government officials

responsible for enforcement. The advice given by the ICRC in this case was not the equivalent of a force majeure by government regulation or order. *Cf. Twombly v. Ass'n of Farmworker Opportunity Programs*, 212 F.3d 80, 85 (1st Cir. 2000) (finding excuse due to government regulation applies to supervening regulation); Stephen G. York, *Re: The Impracticality Doctrine of the U.C.C.*, 29 Duq. L. Rev. 221, 222 (1991) (finding that courts deny discharge if a disruptive event was foreseeable at the time of contract formation). For the above reasons, I would find that the landlord has not established an excuse for nonperformance.

### III. Application of Principles.

As indicated above, I do not believe that an accommodation for an ESA creates a fundamental change to the business of the landlord, and I do not think the accommodation sought by Clark could be denied on that basis. I also reject application of a first-in-time approach in this case. It seems to me we have to consider whether a landlord has provided a reasonable accommodation on a case-by-case basis.

Plainly, under the stipulation, Clark has shown he suffers from a disability and that an ESA would assist him in enjoying equal opportunity in the rental market. The record further shows that Clark received considerable benefit from the ESA in the form of significant decreased reliance on various drugs. The landlord, in its ironic attack on its own accommodation, is skeptical, perhaps, of ESAs generally. But the record in this case supports the notion that the ESA accommodation for Clark was necessary because of his disability and that Clark received substantial benefit from the ESA.

Conversely, the stipulation provides that Cohen experienced allergy attacks as a result of Clark's ESA. There are no facts presented demonstrating that Cohen's reaction to the ESA was currently a serious

threat to her health. Although Cohen's allergy to cats was sufficiently severe enough that she carried an EpiPen to treat herself as necessary, she was clearly currently less allergic to dogs.

The record established, however, that Clark experienced ongoing cold-like symptoms that caused her to be sufficiently uncomfortable that she avoided being in her apartment. She feared that her allergy to dogs, though much less severe than her allergies to cats, could become progressively worse. While Cohen's interest may not have currently given rise to a direct and substantial threat to her health, it was also not merely speculative or *de minimus* as in *Castellano.*

In my view, the mere existence of a run-of-the-mill allergy to dogs does not, in itself, ordinarily override an interest like Clark's in an ESA in determining whether an accommodation is reasonable. In other words, if Cohen's allergy was reasonably manageable and did not have the backdrop of a severe allergy to cats, Clark's interest would likely override the interest of Cohen. But Cohen showed aggravating circumstances of unmanageability of current symptoms and a risk of development of further problems. While Cohen's interest may not have been sufficient to trigger the safe harbor provision related to direct and substantial threat to health, it cannot be ignored in considering reasonable accommodations.

But a reasonable landlord, when considering accommodations for a disabled tenant, must explore all reasonable potential alternatives, particularly in light of the specific and particularized countervailing interest of another tenant. If we carefully review the record in this case, it is clear that the issue of accommodation through offering other similar units was not well developed.

The majority suggests that "Jeff explained to the ICRC employee over the phone that 2800-1 LLC had apartments in other buildings available

that allowed pets and could accommodate Clark's request by renting him a different apartment in a different building." But the record does not support these sweeping statements.

The landlord's representative testified very briefly about discussions with ICRC staff regarding the potential of offering other units to Clark (or Cohen). The brief discussion follows in its entirety.

> Q. Did you have any discussion with anybody at the State of Iowa, the human rights department, about whether you could redirect what apartment tenants live in as a requirement to accommodate an ESA? A. When you say "redirect," what do you mean?

> Q. Could you force them to live in a different apartment? A. Within the complex, you're saying, if there's one available or a different building?

> Q. Either, I guess. Did you have any discussion about that? A. I believe I had spoken with Don Grove [of the Iowa Civil Rights Commission] about what you could do as far as if somebody brings in an ESA and so on. Very vague discussions and no real answer on whether or not we do, but more leaning towards, no, they're where they're at.

> Q. Would it be conceivable to designate a certain portion of your property by isolating with these doors or making an absolute no-pet policy for any specific building? Would that be a conceivable option to put persons with allergies [there]? A. I don't know if—I don't know. I don't know if that's an option.

That is all there is. Obviously, the above passage does not establish whether it would have been possible to relocate Cohen or Clark in another apartment with similar rent and other characteristics owned by the landlord. And, later in testimony, the landlord's representative was simply asked whether the landlord had buildings that allowed pets and received an affirmative answer. But there was no indication of where the buildings were located, whether there were any vacant apartments, and whether the potential alternate apartments were similar to that occupied by Cohen or Clark. We just don't know.

In my view, where the landlord is faced with a conflict between a person who seeks an ESA accommodation and a person who suffers from serious and unmanageable allergies to animals like Cohen, and the interests are close to equipoise, the reasonable landlord must explore the option of providing similar housing in other units owned by the landlord to either the person seeking an accommodation or the person resisting it. The record establishes that the landlord had other housing units that accepted pets, but it is not clear whether such housing was similar to that occupied by Clark, whether the possibility of relocation was pursued with either Clark or Cohen, and whether the alternate locations were acceptable. We do not know whether an accommodation involving moving Clark or Cohen to different apartments would have provided a reasonable resolution that would have recognized the interests of both parties.

Because there is no prior Iowa caselaw holding that a landlord must explore potential relocation options when faced with a conflict between tenants such as that which arose in this case, I would remand the matter to the district court for further proceedings. *Cf. State v. Hoeck*, 843 N.W.2d 67, 71–72 (Iowa 2014) (remanding case where novel issues were raised on appeal and issues were not fully briefed or factually developed).

## IV. Conclusion.

I would dismiss this case on the ground that discretionary review was improvidently granted. On the merits, I would conclude that modification of a no-pets rule by a landlord is not an unreasonable accommodation on the basis that it fundamentally changes the landlord's business. I would further conclude that in considering whether an ESA is a reasonable accommodation, it is permissible to take the health impact on other tenants into consideration. In making the call between conflicting interests of tenants, I would reject a protean first-in-time approach

involving third parties such as other tenants. I also would reject the notion that a landlord is excused from potential contractual liability based upon an informal consultation with the ICRC such as the one that occurred in this case. I would remand the case for further proceedings on the question of whether there were other similar apartments available that could have accommodated the interests of all concerned.

**McDONALD, Justice (dissenting).**

Federal, state, and municipal fair housing laws protect the rights of disabled persons to access to housing on a fair and nondiscriminatory basis. To advance that public policy, the fair housing laws require housing providers to allow disabled persons the use of assistance animals. By way of example:

> A blind applicant for rental housing wants live in a dwelling unit with a seeing eye dog. The building has a *no pets* policy. It is a violation of [federal law] for the owner or manager of the apartment complex to refuse to permit the applicant to live in the apartment with a seeing eye dog because, without the seeing eye dog, the blind person will not have an equal opportunity to use and enjoy a dwelling.

24 C.F.R. § 100.204(b), ex. 1 (2019).

The majority contravenes federal, state, and municipal public policy and holds that, as a matter of state common law, a housing provider is now required to deny a disabled person, including a blind person, access to housing whenever another tenant might experience head-cold symptoms in response to the assistance animal when the other tenant entered into a lease agreement prior in time. The majority's holding is not supported by the common law and is contrary to the letter and spirit of the fair housing laws. I respectfully dissent.

I.

Federal, state, and municipal fair housing laws provide the context for the resolution of Cohen's claims, so I begin there.

A.

It is the public policy of the United States "to provide . . . for fair housing throughout the United States." 42 U.S.C. § 3601 (2018). The federal law applicable here is Title VIII of the Civil Rights Act of 1968, also

known as the Fair Housing Act (FHA). Originally, the FHA prohibited discrimination on the basis of race, color, religion, or national origin in certain housing-related transactions. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. ___, ___, 135 S. Ct. 2507, 2516 (2015). In 1988, Congress passed the Fair Housing Amendments Act (FHAA). Fair Housing Amendments Act of 1988, Pub L. No. 100–430, 102 Stat. 1619 (1988). The FHAA extends the FHA to handicapped persons. *See* 42 U.S.C. § 3602(f) (defining "discriminatory housing practice"). The FHA "broadly prohibits discrimination in housing throughout the Nation." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 93, 99 S. Ct. 1601, 1605 (1979).

Handicapped persons under the FHAA are defined as (1) individuals with "a physical or mental impairment which substantially limits one or more . . . major life activities," (2) individuals with "a record of having such an impairment," and (3) individuals who are "regarded as having such an impairment." 42 U.S.C. § 3602(h). While the FHAA uses the term "handicap," I use the term "disability" because the term "disability" has been adopted by federal agencies and federal courts. *See Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285 & n.2 (11th Cir. 2014); U.S. Dep't of Hous. & Urban Dev. & U.S. Dep't of Justice, *Joint Statement of the Department of Housing and Urban Development and the Department of Justice: Reasonable Accommodations Under the Fair Housing Act* 1 n.2 (May 17, 2004) [hereinafter *HUD & DOJ Joint Statement*], https://www.justice.gov/sites/default/files/crt/legacy/2010/12 /14/joint_statement_ra.pdf [https://perma.cc/2KSX-TMRM].

The FHAA makes it unlawful, as relevant here, for a housing provider to refuse a disabled person's request for accommodation "in rules, policies, practices, or services, when such accommodations may be

necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); *see* 24 C.F.R. § 100.204(a). The act covers all housing with several exceptions not applicable here. *See* 24 C.F.R. § 100.10; U.S. Dep't of Hous. & Urban Dev., FHEO-2020-01, *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act* 2 n.1 (Jan. 28, 2020) [hereinafter HUD FHEO-2020-01 Notice], https://www.hud.gov/sites/ dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf [https://perma .cc/CC29-BCHY] ("The Fair Housing Act covers virtually all types of housing, including privately owned housing and federally assisted housing, with a few limited exceptions.").

To trigger a provider's duty to provide a reasonable accommodation, a disabled person must first make a request for accommodation. *See Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1122–23 (D.C. 2005). Upon receiving a request for accommodation, a provider need not "immediately grant" the request for accommodation. *Bhogaita*, 765 F.3d at 1285–86 ("The FHA does not demand that housing providers immediately grant all requests for accommodation."); *Furbee v. Wilson*, 144 N.E.3d 801, 807 (Ind. Ct. App. 2020). Instead, a provider has an "opportunity to make a final decision" after "conduct[ing] a meaningful review to determine whether the FHA requires the requested accommodation." *Bhogaita*, 765 F.3d at 1286 (quoting *Prindable v. Ass'n of Apartment Owners*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003)).

A housing provider can deny a requested accommodation on the ground there is not a disability-related need for accommodation or on the ground the requested accommodation is not reasonable. *See HUD & DOJ Joint Statement* at 7. With respect to this latter ground, an accommodation is not reasonable "if it would impose an undue financial and administrative

burden on the housing provider or it would fundamentally alter the nature of the provider's operations." *Id.*; *accord Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1220 (11th Cir. 2008); *Giebeler v. M & B Assocs.,* 343 F.3d 1143, 1157 (9th Cir. 2003); *Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer,* 6 F. Supp. 3d 1272, 1281 (S.D. Fla. 2014). "In determining whether the reasonableness requirement has been met, a court may consider the accommodation's functional and administrative aspects, as well as its costs." *Groner v. Golden Gate Gardens Apartments,* 250 F.3d 1039, 1044 (6th Cir. 2001); *see Bryant Woods Inn, Inc. v. Howard County,* 124 F.3d 597, 604 (4th Cir. 1997).

The FHAA vests a housing provider with the sole authority to determine whether an accommodation should be allowed or refused. *See Talley v. Lane,* 13 F.3d 1031, 1034 (7th Cir. 1994) ("Thus, it is within the *[defendant]'s discretion* to find that individuals with a history of convictions for property and assaultive crimes would be a direct threat to other tenants and to deny their applications." (Emphasis added.)). In making the determination, a provider may and should consider the interests of affected tenants. *See id.*; *Hollis v. Chestnut Bend Homeowners Ass'n,* 760 F.3d 531, 541–42 (6th Cir. 2014) ("[T]he burden that the requested modification would impose on the defendant (and perhaps on persons or interests whom the defendant represents) must be weighed against the benefits that would accrue to the plaintiff."); *Scoggins v. Lee's Crossing Homeowners Ass'n,* 718 F.3d 262, 272 (4th Cir. 2013) ("In enacting the FHAA, Congress made clear that the health and safety of other persons are relevant factors in determining whether a person or entity violated the FHAA."); *Groner,* 250 F.3d at 1046. The landlord is not required to sacrifice the interests of third parties on the altar of reasonable accommodation. *See Temple v. Gunsalus,* No. 95-3175, 1996 WL 536710,

at *2 (6th Cir. 1996) ("[Third parties'] rights did not have to be sacrificed on the altar of 'reasonable accommodation.' "). But the final decision to grant or refuse a requested accommodation is left with a provider and is nondelegable. *See, e.g.*, *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 602 (4th Cir. 2010) (explaining "compliance with the [Americans with Disabilities Act (ADA)] and FHA . . . is 'nondelegable' "); *United States v. Dawn Props., Inc.*, 64 F. Supp. 3d 955, 962 (S.D. Miss. 2014) (explaining it is the responsibility of a housing provider "to ensure compliance with the FHA and the ADA" since this "duty [is] *non-delegable*").

If a housing provider denies a requested accommodation, the disabled person may file suit against the landlord for discrimination. If the evidence shows the provider wrongly denied a requested accommodation, the disabled person may recover actual and punitive damages and attorney's fees and costs. 42 U.S.C. § 3613(c)(1)–(2) ("In a civil action . . . if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages . . . [and] a reasonable attorney's fee and costs."). The landlord is liable for a wrongful refusal of a requested accommodation without regard to the landlord's intent. *See Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) (explaining "a plaintiff need not prove the malice or discriminatory animus of a defendant to make out a case of intentional discrimination"); 24 C.F.R. § 100.5(b) (stating "unlawful housing discrimination . . . may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent").

The FHAA does make available to a housing provider affirmative defenses in response to a suit arising under the FHAA. The law provides that nothing in the act "requires that a dwelling be made available to an

individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9); *see Hunt v. Aimco Props., L.P.,* 814 F.3d 1213, 1225 (11th Cir. 2016) ("[T]he direct threat exception described in section 3604(f)(9) is an affirmative defense."); *Velez v. Coral Gate W. Condo. Ass'n,* No. 1:18-CV-24931, 2019 WL 2568856, at *3 (S.D. Fla. 2019) ("The 'direct threat' exception is an affirmative defense for circumstances in which it may be legitimate to protect other residents."); *Bos. Hous. Auth. v. Bridgewaters*, 898 N.E.2d 848, 856 (Mass. 2009).

The FHAA does not give tenants a cause of action to compel a housing provider to deny a disabled person's request for accommodation or a cause of action to seek damages arising out of the landlord's decision to grant a disabled person's request for accommodation. By its own terms, the FHAA affords a private cause of action to any "aggrieved person." 42 U.S.C. § 3613(a)(1)(A). An " '[a]ggrieved person' includes any person who —(1) claims to have been injured *by a discriminatory housing practice*; or (2) believes that such person will be injured *by a discriminatory housing practice* that is about to occur." *Id.* § 3602(i)(1)–(2) (emphasis added). A provider's decision to grant a disabled person's request for accommodation is, by definition, not a discriminatory housing practice. Thus, a tenant in the same building who is adversely affected by a landlord's decision to grant a request for accommodation has no cause of action under the FHAA.

### B.

It is also the public policy of the State of Iowa and the City of Iowa City to protect the right of disabled persons to have fair access to housing. The Iowa Civil Rights Act (ICRA) and the City of Iowa City Human Rights

Code make it unlawful for a housing provider to engage in discriminatory housing practices against disabled persons. *See* Iowa Code § 216.2(5) (2017) (" *'Disability'* means the physical or mental condition of a person which constitutes a substantial disability . . . ."); *id.* §§ 216.8–.8A (making it unlawful to engage in discriminatory housing practices); Iowa City, Iowa, Code § 2-1-1 (2019) (defining disability, in part, as "[t]he physical or mental impairment of a person which substantially limits one or more of such person's major life activities"); *id.* §§ 2-3-5 to -6 (making it unlawful to engage in discriminatory housing practices).

Like the FHAA, state and municipal law prohibit a landlord from refusing a disabled person's request for reasonable accommodations. *See* Iowa Code § 216.8A(3)(*c*)(2) ("[D]iscrimination includes . . . [a] refusal to make reasonable accommodations in rules, policies, practices, or services, when the accommodations are necessary to afford the person equal opportunity to use and enjoy a dwelling."); Iowa City, Iowa, Code § 2-3-6(E)(2) (mirroring Iowa Code § 216.8A(3)(*c*)(2)).

Like the FHAA, state and local law place financial responsibility for a wrongful refusal of a requested accommodation on the housing provider. *See* Iowa Code § 216.17A(6) (stating "if the district court finds that a discriminatory housing or real estate practice has occurred or is about to occur, the district court may award or issue to the plaintiff" "[a]ctual and punitive damages," "[r]easonable attorney's fees," and "[c]ourt costs"); Iowa City, Iowa, Code § 2-4-6(H) ("Payment to the complainant of damages caused by the discriminatory or unfair practice . . . may include actual damages, emotional distress damages, front pay, court costs and reasonable attorney fees.").

Like the FHAA, state and municipal law provide the landlord with an affirmative defense against an action arising under state and municipal

law where the accommodation poses a "direct threat to the health or safety of other persons." Iowa Code § 216.8A(3)(*e*) ("Nothing in this subsection requires that a dwelling be made available to a person whose tenancy would constitute a direct threat to the health or safety of other persons or whose tenancy would result in substantial physical damage to the property of others."); Iowa City, Iowa, Code § 2-3-6(E)(4) (mirroring Iowa Code § 216.8A(3)(*e*)).

Like the FHAA, nothing in state or local law gives affected tenants a cause of action to compel a housing provider to deny a disabled person's request for accommodation or a cause of action to challenge and seek damages arising out of the landlord's decision to grant a disabled person's request for accommodation.

Unlike the FHAA, the ICRA specifically addresses the use of assistance animals. The general assembly amended the ICRA to explicitly allow for the use of an "assistance animal" as a reasonable accommodation. *See* Iowa Code § 216.8B (2020). Under the new law, " '*Assistance animal*' means an animal that qualifies as a reasonable accommodation under the federal Fair Housing Act." *Id.* § 216.8B(1)(*a*). The new law provides, "A landlord shall waive lease restrictions and additional payments normally required for pets on the keeping of animals for the assistance animal or service animal of a person with a disability." *Id.* § 216.8B(2). The new law imposes criminal liability for interference with the right to use an assistance animal. *Id.* § 216.8B(4) ("A person who knowingly denies or interferes with the right of a person with a disability under this section is, upon conviction, guilty of a simple misdemeanor.").

C.

The specific accommodation at issue in this case involves the waiver of a no-pets provision in a lease agreement to allow a disabled person the use of an emotional support animal on premises.

> There are two types of assistance animals: (1) service animals, and (2) other trained or untrained animals that do work, perform tasks, provide assistance, and/or provide therapeutic emotional support for individuals with disabilities . . . . Persons with disabilities may request a reasonable accommodation for service animals and other types of assistance animals, including support animals, under the FHA.

HUD FHEO-2020-01 Notice at 1; *see* Iowa Code § 216C.11 (making it unlawful to deny or interfere with the right of a person to use a "service animal"); *Id.* § 216.8B (providing rights for persons to the use of an "assistance animal").

The majority draws a distinction between disabled persons who use service animals and disabled persons who use emotional support animals, concluding the former are entitled to greater accommodations. The majority does so to escape the rationale of its own opinion, which necessarily requires housing providers to exclude blind persons when an allergic tenant is prior in time. However, the majority's distinction is itself contrary to controlling authority. Under the fair housing laws, the duty to provide reasonable accommodation does not distinguish between service animals and assistance animals. *See* HUD FHEO-2020-01 Notice at 5 ("For support animals and other assistance animals that may be necessary in housing, although the ADA does not provide for access, housing providers must comply with the FHA, which does provide for access."); *see also* Iowa Code § 216.8B(1)(*a*) (requiring accommodation for assistance animals); *Ass'n of Apartment Owners of Liliuokalani Gardens at Waikiki v. Taylor*, 892 F. Supp. 2d 1268, 1285 (D. Haw. 2012) ([T]he Court considers

the development of the FHA and state law to include not only 'service animals,' but 'assistance animals' as reasonable accommodations.'"); *Fair Hous. of the Dakotas, Inc. v. Goldmark Prop. Mgmt., Inc.*, 778 F. Supp. 2d 1028, 1036 (D.N.D. 2011) ("[T]he Court finds the FHA encompasses all types of assistance animals regardless of training, including those that ameliorate a physical disability and those that ameliorate a mental disability."); *Wilkison v. City of Arapahoe*, 926 N.W.2d 441, 449 (Neb. 2019) ("Unlike [the ADA], the FHA does not set forth minimum regulatory requirements for animals to qualify as a reasonable accommodation. Under a ruling by the U.S. Department of Housing and Urban Development, emotional support animals do not require task-specific training." (footnote omitted)). The fact that the animal in this case is an emotional support animal rather than a service animal is immaterial to the outcome.

A landlord's waiver or modification of a no-pets policy to allow a disabled person the use of an emotional support animal is a per se reasonable accommodation. This is true of federal law. *See* 24 C.F.R. § 100.204(b), ex. 1; HUD FHEO-2020-01 Notice at 12 (stating when the assistance animal is one "commonly kept in households," such as a dog or cat, "then the reasonable accommodation should be granted"); *see also Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 110 (3d Cir. 2017) ("A reasonable accommodation under the Fair Housing Act may include the use of an emotional support animal in one's own home, despite the existence of a rule, policy or law prohibiting such an animal."); *Bhogaita*, 765 F.3d at 1289 (holding resident's emotional support animal was a reasonable accommodation under the FHA); *Bryant Woods*, 124 F.3d at 604 ("[E]ven though a prohibition of pets in apartments is common, facially neutral, and indeed reasonable, the FHA requires a relaxation of it to

accommodate a hearing dog for a deaf person because such an accommodation does not unduly burden or fundamentally alter the nature of the apartment complex."); *Baird v. 1600 Church Rd. Condo. Ass'n*, No. 17-4792, 2017 WL 5570333, at \*4 (E.D. Pa. Nov. 17, 2017) ("An emotional support dog can constitute a reasonable accommodation for purposes of the FHA."); *Bone v. Vill. Club, Inc.*, 223 F. Supp. 3d 1203, 1218 (M.D. Fla. 2016) (stating "an alteration to an association's no-pet policy [to allow a tenant an assistance animal is] generally considered a reasonable accommodation"); *Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, 807 (E.D. Cal. 2016) (finding waiver of no-pets policy for an emotional support cat was a reasonable accommodation under the FHA); *Warren v. Delvista Towers Condo. Ass'n*, 49 F. Supp. 3d 1082, 1087 (S.D. Fla. 2014) ("[T]his Court holds that an emotional support animal as defined by the FHA is a reasonable accommodation."); *Petty v. Portofino Council of Coowners, Inc.*, 702 F. Supp. 2d 721, 731 n.8 (S.D. Tex. 2010) ("[S]ervice dogs are a common example of a reasonable accommodation for people with disabilities."). This is true of state law as well. *See* Iowa Code § 216.8B(2) ("A landlord shall waive lease restrictions and additional payments normally required for pets on the keeping of animals for the assistance animal or service animal of a person with a disability.").

## II.

Before directly addressing Cohen's claim, it is necessary to provide context to this suit. While Cohen and 2800 are nominally adverse parties, they each seek the same substantive policy goal: to restrict the use of assistance animals in housing contrary to current understanding of the fair housing laws as set forth above. Cohen acknowledges this in her brief, stating her proposed first-in-time rule "will necessitate the denial of requests for accommodating emotional support [animals] that are made

after the allergic tenant begins their tenancy." Because of their shared substantive policy goal, Cohen and 2800 present this case in a largely nonadversarial manner that has obscured the relevant facts, claims, and issues.

Both parties question the need for and the efficacy of emotional support animals. Cohen notes the "therapeutic value of emotional support animals is still controversial." Cohen cites a study for the proposition that there is no empirically supported theoretical framework justifying the therapeutic uses for animal therapy. For its part, 2800 states the benefit of an emotional support animal is it "*purportedly* allows a person with a mental health disability to function better in society or in some area of their life" and states "the science is mixed on whether emotional support animals are actually effective." (Emphasis added.)

Both parties assail the increased use of emotional support animals. Cohen argues that "emotional support animals have proved to be subject to widespread abuse." The evidence in support of her argument was provided by 2800's leasing and property manager, Jeffrey Clark. Jeffrey Clark testified about the large percentage increase in the number of persons requesting the use of assistance animals. Jeffrey Clark testified that when he tries to enforce the no-pets rule, tenants frequently provide certification several days later that the pet is an assistance animal.

Both parties agree "that the legal standards that govern disabilities appear in practice to have been significantly watered down." The evidence in support of Cohen's claim was provided, again, by 2800's leasing and property manager. Jeffrey Clark testified about how a landlord cannot enforce a no-pets policy because people can easily obtain a certification for an assistance animal. He testified it took him only minutes to obtain a

certification for the use of an emotional support animal from an Internet site.

Both parties agree that assistance animals impose costs on the landlord. Cohen argues that assistance animals increase costs for the landlord for "carpet cleaning and allergen removal." She argues full restoration of an apartment "due to animal waste and urine costs [are] on average between $2200 and $2500." The evidence in support of her claim was provided, again, by 2800's leasing and property manager. Jeffrey Clark testified at trial regarding all the reasons why assistance animals should not be allowed in no-pets housing. 2800 notes Jeffrey Clark testified about the "actual cost to deal with an animal in a unit." He testified regarding the costs of ameliorating and remedying the effects of animals in the apartment units he manages, including the costs of cleaning the units, repairing the units, and pest control.

Both parties agree that a housing provider's waiver to allow an assistance animal on premises is a reasonable accommodation under the fair housing laws. Cohen acknowledges that the recent amendments to the ICRA "eliminate any uncertainty that emotional support/assistance animals are indeed appropriate in general as a reasonable accommodation under the Iowa Civil Rights Act." 2800 acknowledges that "emotional support animals and service animals . . . are, essentially, a per se reasonable accommodation."

Although the parties agree that a housing provider's waiver of a no-pets provision to allow an assistance animal on premises is a reasonable accommodation under the fair housing laws, they request that this court change the law because of the burdens placed on cotenants and landlords. Cohen claims the "burdens to co-tenants and landlords have been ignored." She argues that "there is wide[s]pread abuse of the right to

emotional support animals" and that this court should resolve this knotty problem and "establish precedent balancing the benefits and burdens of emotional support animals among all affected parties." Cohen proposes a complex framework in which tenants with allergies should be required "to provide the same type of documentation required of a disabled tenant." She notes the documentation must be from a healthcare provider. If the allergy is strong enough, she argues, then the landlord should deny the disabled person's request for accommodation if the allergic tenant was first in time. Nowhere does Cohen explain how she derives this complex regulatory scheme from her common law claims for breach of contract and breach of the implied warranty of quiet enjoyment.

Similarly, 2800 acknowledges the relevant law but argues the "current rule that animals are essentially per se reasonable accommodations is clearly wrong." 2800 requests that this "[c]ourt should do away with any notion that an animal is a per se or an easy accommodation to make." 2800 goes on to argue that "[l]andlords who wish to market their buildings and units to people with allergies and people who don't want to live with animals should be able to do so without the requirement that the promises they've made will be broken." As with Cohen, 2800 does not explain how its defense against Cohen's claims would allow this court to do away with the fair housing laws.

The parties have not presented an adversarial legal case. They have jointly presented a legislative briefing seeking to change the fair housing laws to take into account the escalating costs imposed on allergic cotenants and landlords due to the increased use of emotional support animals. I do not minimize the parties' concern. Federal, state, and municipal law, however, countenance this result and require housing providers to allow disabled persons the use of emotional support animals

as an accommodation to provide fair and nondiscriminatory access to housing. The parties concede this. "To whatever extent that the use of [assistance] animals has gotten out of hand, or the needs of allergic people have not been prioritized, the political branches must do the necessary balancing." *Doe v. U.S. Sec'y of Transp.*, 17-CV-7868 (CS), 2018 WL 6411277, at *11 n.9 (S.D.N.Y. Dec. 4, 2018).

## III.

The majority accepts the parties' nonadversarial and joint invitation to rewrite federal, state, and municipal fair housing laws. In so doing, the majority largely ignores the claims and the law actually at issue and instead engages in legislative balancing. I disagree with this approach. We are not bound to give effect to the parties' nonadversarial stipulations regarding liability and defenses where those stipulations are contrary to law. *See, e.g., State v. Aumann*, 236 N.W.2d 320, 322 (Iowa 1975) ("Stipulations as to the law do not settle for the court what the law is, and consequently are of no validity."); *In re Estate of Clark*, 181 N.W.2d 138, 142 (Iowa 1970) (explaining stipulations of fact are binding on the parties but stipulations as to legal issues are not binding on this court if "unreasonable or against good morals or [contrary to] sound public policy"); *see also Mech-Con Corp. v. West*, 61 F.3d 883, 887 (Fed. Cir. 1995) ("We may disregard a stipulation when it is 'inadvertent, contrary to law, contrary to fact, or made without proper authority.' " (quoting *Kaminer Constr. Corp. v. United States*, 488 F.2d 980, 988 (Fed. Cir. 1973))).

## A.

To prevail on her claim for breach of contract, Cohen was required "to prove: (1) the existence of a contract, (2) the terms and conditions of the contract, (3) that [she] has performed all the terms and conditions required under the contract, (4) the defendant's breach of the contract in

some particular way, and (5) that [she] has suffered damages as a result of defendant's breach." *Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 846 (Iowa 2010).

1.

The general principles of contract interpretation and construction are well established. "A cardinal rule of contract construction or interpretation is the intent of the parties must control. The important time frame for determining this intent is the time the contract was executed." *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) (citation omitted). "[E]xcept in cases of ambiguity, [the parties' intent] is determined by what the contract itself says." *DuTrac Cmty. Credit Union v. Radiology Grp. Real Estate, L.C.*, 891 N.W.2d 210, 216 (Iowa 2017) (quoting Iowa R. App. P. 6.904(3)(*n*)). "[W]ords in an agreement are to be interpreted in accordance with their generally accepted meaning." *Farmers & Merchs. Sav. Bank v. Vandenberg Chevrolet-Buick, Ltd.*, 523 N.W.2d 211, 213 (Iowa 1994).

The contract at issue is the lease agreement. Cohen contends 2800 breached paragraph 53 of the lease agreement by authorizing Clark to have a small dog named Cali as an emotional support animal. Paragraph 53 of the lease agreement provides, "No pets are allowed in the building or on the Premises at any time." The same provision also provides, "Reasonable accommodations accepted."

The contract must be interpreted and construed in light of the fair housing laws, which inform and circumscribe the parties' respective rights under the lease agreement. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429–30, 54 S. Ct. 231, 237 (1934) ("[T]he laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly

referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement." (quoting *Von Hoffman v. City of Quincy*, 71 U.S. 535, 550 (1866))); *Miller v. Marshall County*, 641 N.W.2d 742, 751 (Iowa 2002) (stating there is a "presumption that parties incorporate applicable statutes into their contracts"); *Amana Soc'y v. Colony Inn, Inc.*, 315 N.W.2d 101, 111–12 (Iowa 1982) (en banc) (stating "existing laws [are] read into contracts in order to fix obligations as between the parties").

The term "reasonable accommodation" is a term of art within the meaning of the fair housing laws. *See Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 118 n.10 (3d Cir. 2018) (noting an accommodation is a "term[] of art" within the meaning of the FHA); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 466 (6th Cir. 1999) (stating "reasonable accommodation" is a "term[] of art" within the meaning of the ADA). Where, as here, a contract uses a legal term, the term must be interpreted and construed in accord with its generally accepted legal usage. *See R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co.*, 156 A.3d 539, 647 (Conn. App. Ct. 2017) ("Words with a fixed legal or judicially settled meaning must be presumed to have been used in that sense." (quoting *Keeper's, Inc. v. ATGCKG Realestate, LLC*, 80 A.3d 88, 93 (Conn. App. Ct. 2013))), *aff'd*, 216 A.3d 629 (Conn. 2019); *Sandt v. Energy Maint. Servs. Grp. I, LLC*, 534 S.W.3d 626, 636 (Tex. App. 2017) ("Words used by the parties in a technical sense or which have become terms of art through routine usage in a particular context should be construed consistent with that usage."); Restatement (Second) of Contracts § 202, at 86 (Am. Law Inst. 1981) (stating "where language has a generally prevailing meaning, it is interpreted in accordance with that meaning" and "words of art are given their technical meaning"); 11 Richard A. Lord, *A Treatise on the Law of*

*Contracts* § 32:4, at 682 (4th ed. 2012) ("Technical terms or words of art will be given their technical meaning.").

In light of the applicable law, the terms of the lease agreement are not ambiguous. An accommodation is unreasonable within the meaning of the fair housing laws only "if it would impose an undue financial and administrative burden on the housing provider or it would fundamentally alter the nature of the provider's operations." *HUD & DOJ Joint Statement* at 7; *accord Schwarz*, 544 F.3d at 1220; *Giebeler*, 343 F.3d at 1157; *Sabal*, 6 F. Supp. 3d at 1281. Under the FHAA, the waiver of a no-pets provision does not fundamentally alter the nature of the dwelling. As the Sixth Circuit explained,

> One would naturally say that a blind tenant requests an accommodation from an apartment's "no pets" policy if the tenant seeks an exemption for a seeing eye dog. But one would not naturally say that *a tenant with allergies requests an accommodation from an apartment's "pet friendly" policy if the tenant seeks a total pet ban.* The former tenant seeks a *one-off adjustment*; the latter seeks a *complete change.* The word "accommodation" includes the first, but not the second, request.

*Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 490 (6th Cir. 2019) (first emphasis added) (citation omitted) (distinguishing between "moderate adjustments" and "fundamental changes" to housing policies), *cert. denied*, ___ U.S. ___, ___ S. Ct. ___ (2020). Thus, the Department of Justice, the Department for Housing and Urban Development, federal courts, and Iowa law all conclude the waiver of a no-pets provision to allow a disabled person to keep an assistance animal on premises is per se a reasonable accommodation. *See* Iowa Code § 216.8B(2) (2020); 24 C.F.R. § 100.204(b); HUD FHEO-2020-01 Notice at 12; *see also Revock*, 853 F.3d at 110; *Bhogaita*, 765 F.3d at 1289; *Bryant Woods*, 124 F.3d at 604; *Baird*, 2017 WL 5570333 at *4; *Bone*, 223 F. Supp. 3d at 1218; *Castellano*, 181

F. Supp. 3d at 807; *Warren*, 49 F. Supp. 3d at 1087; *Petty*, 702 F. Supp. 2d at 731 n.8.

The reasonable accommodation language in the contract put Cohen on notice that 2800 would make exceptions to its no-pets policy as part of a reasonable accommodation for another tenant. There was no qualification in the lease agreement restricting the types of assistance animals that would be allowed on premises. To the extent Cohen assigned a different meaning and construction to the term "reasonable accommodation" that excluded the possibility cats and dogs would be allowed on premises, that meaning and construction was unique to her.

Cohen's undisclosed but more limited understanding of the contract is a unilateral mistake that cannot support her claim for liability against 2800. *See Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011) (stating in determining mutual intention, "we look to what the parties did and said, rather than to some secret, undisclosed intention they may have had in mind" (quoting *Waechter v. Aluminum Co. of Am.*, 454 N.W.2d 565, 568 (Iowa 1990))); *First Nw. Nat'l Bank v. Crouch*, 287 N.W.2d 151, 153 (Iowa 1980) (stating "[t]he intention expressed in the instrument prevails over the secret intention of" a party); Restatement (Second) of Contracts § 151 cmt. *a*, at 383–84 ("An erroneous belief as to the contents or effect of a writing that expresses the agreement is, however, a mistake. Mistake alone, in the sense in which the word is used here, has no legal consequences."); *id.* cmt. *b*, at 384 ("The rules stated in this Chapter do not draw the distinction that is sometimes made between "fact" and "law." They treat the law in existence at the time of the making of the contract as part of the total state of facts at that time. A party's erroneous belief with respect to the law, as found in statute, regulation, judicial decision, or elsewhere, or with respect to the legal consequences of his acts, may,

therefore, come within these rules."); 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.5, at 15 (Joseph M. Perillo ed., rev'd ed. 1998) ("Inasmuch as the parties may have attached different meanings and may have had different intentions at the time of formation of the contract, the court must determine which party's meaning and intention should prevail.").

This has long been the law of Iowa. *See Bakke v. Bakke*, 242 Iowa 612, 618, 47 N.W.2d 813, 817 (1951) ("The maxim '*ignorantia legis non excusat*' is stated throughout the books as an elementary proposition; and when you look for the doctrine of law on this subject, you find it to be that equity will not relieve against a mistake of law." (quoting *Pierson v. Armstrong*, 1 Iowa 282, 286 (1855))); *Peterson v. McManus*, 187 Iowa 522, 537, 172 N.W. 460, 466 (1919) ("If it was his intention to claim that he used it in some unusual sense, the plaintiff had the right to object that he could not be bound by the undisclosed purpose to use the word in a sense which differed from what plaintiff would naturally understand by the use of that word."); *Spencer v. Millisack*, 52 Iowa 31, 34, 2 N.W. 606, 609 (Iowa 1879) ("In a suit upon the contract its real, and not its supposed, meaning must prevail.").

For these reasons, I would hold Cohen failed to prove 2800 breached the lease agreement when it accommodated Clark's request for an emotional support animal as it was expressly allowed to do under the plain language of the lease agreement.

2.

The majority rejects these principles of contract interpretation and concludes 2800 breached the lease agreement by accommodating Clark's request because Cali posed a direct threat to Cohen's health and safety within the meaning of 42 U.S.C. § 3604(f)(9). I respectfully disagree.

First, the majority confuses a claim arising under the fair housing laws with Cohen's contract claim. The question presented is not whether 2800 could have successfully defended a fair housing claim brought by Clark had 2800 denied the requested accommodation. The question presented is the meaning of the contract at "the time the contract was executed." *Hartig Drug Co.*, 602 N.W.2d at 798; *see Peak*, 799 N.W.2d at 544; Restatement (Second) of Contracts § 202 cmt. *b*, at 87. On the relevant question, as a matter of federal, state, and municipal housing law, the meaning of reasonable accommodation is well established and generally accepted. The waiver of a no-pets provision is per se a reasonable accommodation.

Second, the majority misapprehends the fair housing laws. The direct-threat provision does not change the meaning of reasonable accommodation. The direct-threat provision serves as an affirmative defense for a housing provider to avoid liability for denying a requested accommodation. *See Hunt*, 814 F.3d at 1225 ("But the direct threat exception described in section 3604(f)(9) is an affirmative defense . . . ."); *Dadian v. Village of Wilmette*, 269 F.3d 831, 840–41 (7th Cir. 2001) ("[W]e conclude that a public entity that asserts the reason it failed to accommodate a disabled individual was because she posed a direct threat to safety bears the burden of proof on that defense at trial."); *Velez*, 2019 WL 2568856, at *3 ("The 'direct threat' exception is an affirmative defense for circumstances in which it may be legitimate to protect other residents."); *Simmons v. T.M. Assocs. Mgmt., Inc.*, 287 F. Supp. 3d 600, 604 n.1 (W.D. Va. 2018) (same); *Township of West Orange v. Whitman*, 8 F. Supp. 2d 408, 428 (D.N.J. 1998) (same); *Bos. Hous. Auth.*, 898 N.E.2d at 856 (same).

In other words, the direct-threat provision is an exception to the duty to provide reasonable accommodation; it does not change the meaning of what is a reasonable accommodation. *See* 42 U.S.C. § 3604(f)(9); Iowa Code § 216.8A(3)(*e*) (2017); Iowa City, Iowa, Code § 2-3-6(E)(4); *Hernandez v. Golf Course Estates Home Owners Ass'n*, ___ F. Supp. 3d ___, ___, 2020 WL 1821011, at *6 (D. Or. Apr. 10, 2020) ("The FHAA does not require that an accommodation be made if it 'would constitute a direct threat to the health or safety of other individuals . . . .' " (quoting 42 U.S.C. § 3604(f)(9))); *Velez*, 2019 WL 2568856, at *3 ("The FHA carves out an exception for those who pose a 'direct threat to the health or safety' of others." (quoting 42 U.S.C. § 3604(f)(9))). As one court explained,

> [I]f a handicapped tenant is a direct threat to the health and safety of other tenants, the landlord is obligated to either reasonably accommodate the tenant's handicap or show that no reasonable accommodation will eliminate or acceptably minimize the risk posed by the handicapped tenant. When the landlord shows that no reasonable accommodation will curtail the risk, its duty to accommodate ceases.

*Arnold Murray Constr., L.L.C. v. Hicks*, 621 N.W.2d 171, 175 (S.D. 2001). Thus, even if Cali posed a direct threat to Cohen, it does not change the generally accepted meaning of reasonable accommodation as used in the parties' contract. It simply means 2800 could have denied Clark's requested accommodation and asserted the direct-threat provision as an affirmative defense in the event Clark had sued 2800 for discrimination under the fair housing laws.

Third, and related, the majority's construction of the direct-threat provision is contrary to the purpose of the statute. Section 3604(f)(9) is "intended to establish an affirmative defense available to landlords . . . in actions against them to enforce the FHAA, not to provide a basis for claims such as those asserted by . . . neighbors." *Township of West Orange*, 8 F.

Supp. 2d at 428. But here the majority does just that. The majority creates a private cause of action for tenants to enforce the fair housing laws against disabled persons and landlords who accommodate them. If the lease agreement at issue in this case contained only the no-pets provision without the reasonable accommodation provision, 2800 still would have been obligated under the fair housing laws to consider Clark's request for accommodation. Under the majority's interpretation of the fair housing laws, however, Cohen would nonetheless be entitled to sue Clark for having an assistance animal and 2800 for allowing Clark to have an assistance animal on premises because the animal posed a direct threat to Cohen within the meaning of the statute. The majority has weaponized the statutory affirmative defense into a cause of action for neighbors to sue disabled persons and landlords. The lack of any statutory right or remedy in the ICRA for tenants affected by a disabled person's exercise of his or her rights counsels strongly against creating a de facto private cause of action allowing the same. *See Shumate v. Drake Univ.*, 846 N.W.2d 503, 516 (Iowa 2014) (holding "there is no implied private right of action under Iowa Code chapter 216C" where the legislature specifically afforded private rights of action under other provisions of the ICRA).

Fourth, it is also not clear that the direct-threat analysis is even applicable to the facts and circumstances of this case. Federal and state enforcement guidelines provide that a "determination that an assistance animal poses a direct threat of harm to others . . . must be based on an individualized assessment that relies on objective evidence *about the specific animal's actual conduct*." U.S. Dep't of Hous. & Urban Dev., FHEO-2013-01, *Service Animals and Assistance Animals for People with Disabilities in Housing & HUD-Funded Programs* 3 (April 25, 2013) [hereinafter HUD FHEO-2013-01 Notice] (emphasis added),

https://archives.hud.gov/news/2013/servanimals_ntcfheo2013-01. pdf [https://perma.cc/ AKA3-2425]; *see* Iowa Civil Rights Comm'n, *ICRC Factsheet: Assistance Animals and the Fair Housing Act; Service Animals and the Americans with Disabilities Act* (Rev. Sept. 2015) [hereinafter *ICRC Factsheet*], https://icrc.iowa.gov/sites/default/files/publications/2015 /AssistanceAnimalsFactSheet.pdf[https://perma.cc/QLD2-CV5K]. This requires an "individualized assessment that is based on objective evidence about the specific animal in question, such as the animal's current conduct or a recent history of overt acts." *Friedel v. Park Place Cmty. LLC*, 2017 WL 3666440, at *3 (S.D. Fla. 2017) (quoting Preamble to Final Rule, *Pet Ownership for the Elderly and Persons with Disabilities*, 73 Fed. Reg. 63834, 63837 (Oct. 27, 2008) [hereinafter Preamble]), *aff'd*, 747 F. App'x 775 (11th Cir. 2018) (per curiam).

Cohen does not ask that we consider Cali's actual conduct or overt acts. Instead, she asks that we consider Cohen's physical reactions to Cali's mere presence. The guidelines prohibit a housing provider from making categorical exclusions based on "[b]reed, size, and weight limitations." HUD FHEO-2013-01 Notice at 3; *see ICRC Factsheet*. But here, Cohen asks us to make even larger categorical exclusions and disallow all cats, dogs, and any other animal that creates "pet dander." Cohen's categorical exclusions seem to fall outside the ambit of the direct-threat provision.

Fifth, even assuming an allergic response to an assistance animal could, under some circumstances, constitute a direct threat within the meaning of section 3604(f)(9), Cohen failed to prove Cali posed a direct threat to her health or safety within the meaning of the statute. In determining whether a party has proved a direct threat, the statutory exemption must be construed narrowly to advance the purposes of the fair

housing laws. *See Bangerter*, 46 F.3d at 1503–04 (explaining the legislative history and purpose of the FHAA and finding section 3604(f)(9) and other "exceptions to the FHAA's prohibitions on discrimination should be narrowly construed"); *Hogar Agua y Vida en el Desierto, Inc. v. Suarez–Medina*, 36 F.3d 177, 181 (1st Cir. 1994) (stating "ambiguous exemptions from FHA liability are to be *narrowly* construed"); *Laflamme v. New Horizons, Inc.*, 605 F. Supp. 2d 378, 392 (D. Conn. 2009) ("The FHA, regulations, and legislative history . . . make clear that [the direct-threat provision] has a very narrow reach."); *United States v. City of Jackson*, 318 F. Supp. 2d 395, 414 (S.D. Miss. 2002) (stating the direct-threat provision is "a narrow exemption to coverage"), *aff'd*, 359 F.3d 727 (5th Cir. 2004).

A "direct threat" is "a significant risk of substantial harm." *HUD & DOJ Joint Statement* at 4. The risk of substantial harm must be more than remote or speculative. *See Warren*, 49 F. Supp. 3d at 1087 ("[T]he presumption in favor of a reasonable accommodation is such that 'the Fair Housing Act requires the existence of a significant risk—not a remote or speculative risk.' " (quoting Preamble, 73 Fed. Reg. at 63837)). The party seeking to invoke the direct-threat exemption must have "reliable, objective evidence that a person with a disability poses a direct threat before" a reasonable accommodation can be denied. *HUD & DOJ Joint Statement* at 5.

Cohen did not meet the high burden of establishing Cali posed a significant risk of *substantial harm* to her health. Although the parties stipulated Cohen "is allergic to dogs and cats" and suffered "allergic attacks" due to Cali's presence in the building, the parties did not stipulate to the nature of the attacks. The evidence shows, and Cohen herself stated "there is a difference between [her allergic responses to] cat[s] and dog[s]."

Cohen can "actually tell the difference between a cat and a dog" depending on the allergy symptoms she experiences. Cohen testified,

> So with a cat, within seconds of exposure my throat begins to close up, and for the past few years I've had to carry around EpiPens due to the severity of it, where with dogs, my nose just gets stuffy and, you know, my sinuses get swollen upon exposure.

She testified Cali caused her to experience "head cold" symptoms, but minus the "foggy" feeling that makes it "difficult to concentrate" when one has a cold. Her symptoms included stuffy nose, postnasal drip, constant coughing, and excess mucus in her throat. An affidavit from Cohen's allergist further clarified the distinction. The affidavit states Cohen suffers from allergies to "cat and dog hair and dander." It also states Cohen has "cat and dog sensitivities." Finally, it states Cohen "has a history of particularly severe allergic reactions including oropharyngeal swelling when exposed to cats."

There is no evidence in the record showing Cohen's exposure to dogs, generally, or Cali, specifically, caused Cohen to suffer anything other than cold-like symptoms. Allergy-induced cold-like symptoms in response to the presence of an emotional support animal does not amount to "substantial harm" within the meaning of the fair housing laws. *See HUD & DOJ Joint Statement* at 4; *see also Maubach v. City of Fairfax*, No. 1:17-cv-921, 2018 WL 2018552, at *6 n.7 (E.D. Va. Apr. 30, 2018) ("If Mr. B were a service animal under Title II or III of the ADA, as he is not on this record, then allergies would not be sufficient on their own to justify barring Mr. B from public spaces."); *Entine v. Lissner*, No. 2:17-cv-946, 2017 WL 5507619, at *6, *8 n.6 (S.D. Ohio Nov. 17, 2017) ("Allergies and fear of dogs are not valid reasons for denying access or refusing service to people using service animals."). Thus, even if the direct-threat provision were

relevant to the disposition of Cohen's claim for breach of contract, she has not proved a direct threat to her health and safety within the meaning of section 3604(f)(9).

The majority's analysis of the direct-threat provision might have some purchase if 2800 were invoking the provision as an affirmative defense against a claim brought by Clark under the fair housing laws in the event 2800 had denied Clark's request for accommodation. But the majority's analysis of the direct-threat provision provides no basis for holding 2800 is liable to Cohen under a theory of contract when 2800 granted a reasonable accommodation as expressly allowed in the text of the parties' agreement.

3.

An additional consideration militates against the majority's interpretation of the lease agreement. Consider the implications of the majority's opinion. If 2800's decision to grant Clark's request to keep an assistance animal on premises was not a "reasonable accommodation" as a matter of contract law, then 2800 breached the same provision of the lease agreement with respect to each of the tenants in the building. This is true without regard to whether those tenants had any allergies to Clark's assistance animal because they too contracted to live in a no-pets apartment building subject to reasonable accommodation. While those tenants may have suffered only nominal damages, if any, they still would be able to establish breach as a matter of law. That result to me seems untenable, and it is unaddressed by the majority opinion.

B.

Cohen also contends 2800 breached her right to quiet enjoyment of her dwelling when 2800 failed to deny Clark's request for an accommodation under federal, state, and municipal laws intended to

protect the rights of disabled persons to access housing on a fair and nondiscriminatory basis.

A claim for breach of quiet enjoyment is a limited one. "It is generally recognized that an eviction [or constructive eviction] is necessary to constitute a breach of warranty of title or for quiet enjoyment." *Kendall v. Lowther*, 356 N.W.2d 181, 190 (Iowa 1984) (quoting *Eggers v. Mitchem*, 240 Iowa 1199, 1201–02, 38 N.W.2d 591, 592 (1949)); *see also United States v. G & T Enters., L.C.*, 978 F. Supp. 1232, 1242 (N.D. Iowa 1997) (requiring actual or constructive eviction for a breach of a quiet enjoyment provision in a lease); *Duck Creek Tire Serv., Inc. v. Goodyear Corners, L.C.*, 796 N.W.2d 886, 895 (Iowa 2011) ("When a tenant is actually evicted from the leased premises, a breach of the covenant of quiet enjoyment has occurred."); K.A. Drechsler, Annotation, *What Amounts to Constructive Eviction Which Will Support Action for Breach of Covenant of Warranty or for Quiet Enjoyment*, 172 A.L.R. 18, at 20–21 (1948) ("While it is generally recognized that an eviction is necessary to constitute a breach of a covenant of warranty or for quiet enjoyment . . . the modern rule supported by the overwhelming weight of authority is to the effect that it is not essential that there be an actual expulsion of the grantee, a constructive eviction being sufficient." (footnotes omitted)).

Cold-like symptoms do not constitute a constructive eviction. The implied warranty protects only against conditions that materially affect the health and safety of tenants. It sets a minimum standard to protect tenants against conditions that render premises uninhabitable or unusable. That is not this case. Cohen failed to prove her claim.

## C.

There is an additional, and more fundamental, reason why Cohen's common law claims fail. The heart of the issue is whether the law of

contract and quiet enjoyment require a landlord to aggressively deny the statutory rights of disabled persons and risk substantial civil and criminal liability. The majority says yes. The relevant precedents say no. In accord with these precedents, I would hold the doctrine of prevention by government regulation excused any breach of contract or breach of the warranty of quiet enjoyment under the circumstances presented.

Generally, where a law, regulation, order, or any other government action affects a party's performance in such a way that it is impracticable for him both to comply with the regulation or order and to perform, then the party's failure to perform is discharged so long as the party made a good faith effort to perform in accord with the contract and the relevant law, regulation, order, or government action. *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) ("A party breaches a contract when, *without legal excuse*, it fails to perform any promise which forms a whole or a part of the contract." (Emphasis added.)); Restatement (Second) of Contracts § 264 cmt. *b*, at 333 (stating that the government "regulation or order must directly affect a party's performance in such a way that it is impracticable for him both to comply with the regulation or order and to perform" and that a party who seeks to justify nonperformance due to limitations imposed by law "must have observed the duty of good faith and fair dealing"). One court has called this "the doctrine of prevention by governmental regulation or order." *Union Cty. Utils. Auth. v. Bergen Cty. Utils. Auth.*, 995 F. Supp. 506, 516 (D.N.J. 1998).

In a recent case, this court recognized that a landlord's breach of the duty of quiet enjoyment and breach of the landlord tenant act would be excused where the landlord was acting in accord with a governmental command:

> There is ample authority for the proposition that when a landlord takes action pursuant to an order of a public official, a breach of the covenant of quiet enjoyment does not occur. We think the same reasoning applies when a claim is made that the landlord violates provisions of the [Iowa Uniform Residential Landlord and Tenant Act] when acting pursuant to an order by municipal authorities.

*Lewis v. Jaeger*, 818 N.W.2d 165, 179–80 (Iowa 2012) (citations omitted).

The doctrine this court recognized in *Lewis* is grounded in public policy. As the United States Court of Appeals for the Tenth Circuit explained, discharging a party's contractual liability based on compliance with regulatory commands is in accord with public policy:

> [A]s a matter of policy, individuals and corporations who cooperate with local regulatory agencies and comply with the letter and spirit of legally proper regulations, environmental or otherwise, are to be encouraged.

*Int'l Minerals & Chem. Corp. v. Llano, Inc.*, 770 F.2d 879, 887 (10th Cir. 1985). This is true so long as the party seeking refuge under the doctrine acted in good faith. *See id.* ("There is, we recognize, a limit to the extent to which an individual can seek refuge in the context of a case such as this by cooperating with the government: 'any action by the party claiming excuse which causes or colludes in inducing the governmental action preventing his performance would be in breach of good faith and would destroy his exemption.' " (quoting N.M. Stat. Ann. § 55–2–615 cmt. 10 (1978))); *McCullough v. Houar*, 141 Iowa 342, 343–44, 117 N.W. 1110, 1111 (1908) (finding no breach of the covenant of quiet enjoyment where a landlord made a good faith effort to remedy issues caused by another tenant).

Here, 2800 acted in good faith both to comply with the fair housing laws and to honor its contractual obligations to Cohen. 2800 and Cohen entered into a lease agreement in which both parties acknowledged 2800 might make "reasonable accommodations" within the meaning of the fair

housing laws. It is generally understood that a modification of a no-pets provision to allow for the use of an assistance animal is a reasonable accommodation within the meaning of the fair housing laws. Clark requested 2800 allow him to keep Cali on premises as an emotional support animal. Upon receiving Clark's documented request, 2800 notified all tenants in the building it was going to allow a dog to live on the premises and asked tenants with any issues or allergies to notify 2800. Cohen responded and notified 2800 she was allergic to dogs. 2800 then contacted the Iowa Civil Rights Commission (ICRC) for guidance. The ICRC advised 2800 it should not refuse Clark's request for accommodation. Upon the advice and guidance of the ICRC, 2800 granted Clark's requested accommodation and initiated an interactive process with Clark and Cohen to find solutions that accommodated both parties. Through this interactive process the parties adopted several measures to limit Cohen's exposure to Cali. This included designating separate entrances, stairways, and hallways for the parties. 2800 also purchased an air purifier for Cohen's apartment. 2800's efforts did not eliminate Cohen's allergy symptoms. In an effort to further ameliorate Cohen's allergy symptoms, 2800 explored other measures, including the installation of airlock doors. 2800 determined, and the parties agree, the installation cost of the doors, $81,715.92, was unreasonable and not required under the circumstances. The parties do not dispute 2800 acted in good faith to comply with the law and ameliorate the conditions for Cohen.

While 2800's ameliorative efforts were not successful and Cohen may have suffered actual harm due to the presence of Clark's emotional support animal in the building, the harm was without legal injury at common law. "At common law, this sort of 'factual harm without a legal

injury was *damnum absque injuria* and provided no basis for relief.'" *United States v. Sineneng-Smith*, 590 U.S. ___, ___, 140 S. Ct. 1575, 1587 (2020) (Thomas, J., concurring) (quoting F. Andrew Hessick, *Standing, Injury in Fact, & Private Rights*, 93 Cornell L. Rev. 275, 280–81 (2008)). The maxim recognizes that, in some circumstances, private interest must give way to a superior public right. *See United States v. Willow River Power Co.*, 324 U.S. 499, 508, 510, 65 S. Ct. 761, 766–67 (1945) ("Where these interests conflict they are not to be reconciled as between equals, but the private interest must give way to a superior right . . . .").

Under this doctrine, Cohen's harm cannot support a claim for liability under a theory of contract or implied warranty because she suffered no legal injury. Stated differently, Cohen is not entitled to compensation from 2800 because 2800 committed no legal wrong. 2800 acted in good faith to comply with the command of federal, state, and municipal law. It did so under the threat of substantial civil liability and criminal liability for the failure to comply. Cohen's harm was caused not by 2800's conduct but by the dictates of federal, state, and local law. Because of this, she has suffered no legally cognizable injury. *See Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F. Supp. 2d 775, 780 (W.D. Mich. 2006) ("In addition, a breach of contract claim must be rejected where the breach, if any, is '*damnum absque injuria*.'"); *Keller v. Clark Equip. Co.*, 474 F. Supp. 966, 969 (D.N.D. 1979) ("Injury is usually but not always contemporaneous with the wrongful act. It is the conjunction of damage and wrongful act that creates a cause of action for tort or contract, and there is no cause of action if either damage or wrong is wanting."); *Palmer v. Del., Lackawanna. & W. R.R.*, 120 A. 668, 669 (Pa. 1923) ("No cause of action arises from the doing of a lawful act or the exercise of a legal right, if done or exercised in a lawful and proper manner; the

resulting damage, if any, being damnum absque injuria." (quoting 1 Corpus Juris 965)); *Ayala v. City of Corpus Christi*, 507 S.W.2d 324, 326 (Tex. Civ. App. 1974) ("An action will not lie for an injury resulting from the mere exercise of a legal right, or from the commission of a lawful action in a proper manner. The doctrine of damnum absque injuria (damage without injury) applies, and the loss is not cognizable in the law.").

The fact that there was no formal government order to grant Clark's request for accommodation does not change the analysis. *See Int'l Minerals*, 770 F.2d at 887 ("Second, as a matter of law, government policy need not be explicitly mandatory to cause impracticability."). 2800 was exposed to significant risk in the event it denied Clark's request for accommodation and could not carry its burden to prove an affirmative defense. Under federal, state, and municipal law, Clark, the Department of Justice, the ICRC, or the Iowa City Human Rights Commission could have pursued an enforcement action or statutory action against 2800. 2800 could have been forced to pay: compensatory damages, including out-of-pocket expenses; noneconomic damages for humiliation, mental anguish, and psychological injuries; punitive damages; attorney's fees; civil penalties; and additional penalties up to $100,000. *See* 42 U.S.C. §§ 3612–3614; Iowa Code § 216.17A(6) (2017); Iowa City, Iowa, Code § 2-4-6(H). In addition, the revised ICRA imposes criminal liability for a knowing violation of state fair housing law. *See* Iowa Code § 216.8B(4) (2020). Thus, while it is true 2800 could have denied Clark's request for accommodation, a party has no obligation to break the law or exhaust all legal challenges before being discharged from liability. *See Directions, Inc. v. New Prince Concrete Constr. Co.*, 491 A.2d 1347, 1349 (N.J. Super. Ct. App. Div. 1985) (explaining compliance with government order could still serve as a defense even though the party could have legally challenged the

validity of the order); Restatement (Second) of Contracts § 264 cmt. *a*, at 331 ("The fact that it is still possible for a party to perform if he is willing to break the law and risk the consequences does not bar him from claiming discharge.").

2800 was subject to competing demands. Port side was Scylla, a six-headed monster of federal, state, and municipal housing laws. Starboard side was Charybdis, the whirlpool of Cohen's common law rights. The majority holds a landlord must sail directly toward one or the other: the landlord can refuse the accommodation and be eaten by enforcement actions and discrimination lawsuits brought by federal authorities, state authorities, municipal authorities, and disabled persons; or the landlord can grant the accommodation and drown in absolute liability to all tenants injured by the landlord's waiver of the no-pets provision. The relevant precedents say the landlord can successfully navigate the strait by acting in good faith to comply with the fair housing laws and its contractual obligations. I would adhere to those precedents and hold 2800 is not liable to Cohen under the circumstances presented.

IV.

In addition to not being supported by the law of contract or quiet enjoyment, the majority's holding itself is a prohibited discriminatory housing practice that violates the letter and spirit of the fair housing laws.

The FHAA provides that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615; *see Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S. Ct. 2476, 2481 (1991) ("[S]tate laws that 'interfere with, or are contrary to the laws of congress, made in

pursuance of the constitution' are invalid." (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824))).

The FHA provides relief not only from policies adopted and actions taken with a discriminatory intent, but also from the application of facially neutral standards that have an unlawful discriminatory effect upon a protected class. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 933–34 (2d Cir. 1988), *abrogated on other grounds by MHANY Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016). "A disparate impact analysis examines a facially-neutral policy or practice . . . for its differential impact or effect on a particular group." *Huntington Branch*, 844 F.2d at 933. To establish a prima facie case under this theory, a plaintiff must show: "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir.1997) (quoting *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996)).

Here, the majority adopts Cohen's facially neutral first-in-time rule, the same rule 2800 proposed at trial, that requires providers to deny a disabled person's request for accommodation. The parties concede this will result in the denial of housing to disabled persons. Indeed, that is the parties' intended result, which the majority willingly adopts. Cohen wants to limit the use of emotional support animals because "there is wide[s]pread abuse of the right to emotional support animals." 2800 does not want to have to comply with the fair housing laws so it can market its property as pet free. 2800 argues this "court should do away with any notion that an animal is a per se or an easy accommodation to make."

2800 goes on to argue that "[l]andlords who wish to market their buildings and units to people with allergies and people who don't want to live with animals should be able to do so."

By adopting the parties' proposed first-in-time rule, the majority has adopted a rule of law that "require[s] or permit[s] an[] action that would be a discriminatory housing practice" and that is preempted under 42 U.S.C. section 3615. 42 U.S.C. § 3615; *see Toledo Fair Hous. Ctr. v. Farmers Ins. Grp. of Cos.*, 61 F. Supp. 2d 681, 683 (N.D. Ohio 1999) (noting laws are preempted where the law "is itself a 'discriminatory housing practice.' " (quoting 42 U.S.C. § 3615)).

The First Circuit addressed a similar issue in *Astralis Condominium Ass'n v. Secretary, United States Department of Housing & Urban Development*, 620 F.3d 62 (1st Cir. 2010). In that case, two disabled persons sought an accommodation that allowed them exclusive access to two of ten handicapped parking spaces closest to their units. *Id.* at 64–65. The ten handicapped parking spaces were considered common elements and available on a first-come-first-served basis. *Id.* at 64. The condominium association denied the requested accommodation, relying on the local condominium law and the association's private agreement, both of which required the consent of all the condominium unit owners before transferring common elements. *Id.* at 69–70. The First Circuit concluded the association's reliance on the local law and association agreement was not grounds for denying the rights of the disabled to access housing. The court explained the association was "duty bound" not to enforce local law "if doing so would either cause or perpetrate unlawful discrimination." *Id.* at 69. The court also quickly rejected and derided the association's contract argument, stating, "[A]dopting Astralis's view would create a sinkhole that would swallow the general rule and cripple the

effectiveness of the FHAA. To say that private agreements under a state's condominium statute are capable of trumping federal anti-discrimination law verges on the ridiculous. We disavow that proposition." *Id.* at 70.

The same rationale applies here with greater force where Cohen's claimed right arises from the very lease term from which Clark seeks accommodation. There is nothing in the fair housing laws that allows a housing provider to deny a requested accommodation on the ground that the disabled person is second in time. The rule is an arbitrary amendment to the fair housing laws. The court in *Entine* rejected this first-in-time rule in a similar case arising under the ADA. In that case, Entine lived in a sorority house with her service animal. 2017 WL 5507619, at *1. Another member of the sorority, Goldman, claimed to be allergic to the service animal. *Id.* Goldman suffered from Crohn's disease, and she claimed the allergies exacerbated her Crohn's disease and caused her significant pain and distress. *Id.* Because the matter involved a university, the conflict between the parties was presented to the university's ADA Coordinator, Lissner. "Lissner determined that 'the resolution for this impasse [was] based on who secured their lease first. Lissner decided that whoever secured their lease second would have the choice to move out of the [sorority] house, or stay in the house without their accommodation.' " *Id.* at *5. Lissner determined Entine and her service animal would have to vacate the sorority house. *Id.* Entine challenged this finding in district court. The district court concluded the first-in-time rule was improper, calling it an "arbitrary, 'disability-neutral standard.' " *Id.* at *9. The district court granted Entine's request for a preliminary injunction and restrained the university from removing her from the house. *Id.* at *11.

Even if not expressly preempted by federal law as a discriminatory housing practice, the majority's first-in-time rule is certainly contrary to

the spirit of federal, state, and municipal fair housing laws. The majority rule creates financial incentives for cotenants to sue disabled persons seeking reasonable accommodations and landlords granting reasonable accommodations. Under the majority's rule, the cotenant can usurp the statutory authority granted to a housing provider and demand the provider deny a requested accommodation under the threat of a lawsuit all without bearing any of the financial consequences if the denial is in fact wrong. If the cotenant prevails on her claim, the disabled person (remember, Cohen sued Clark, and the majority's theory of liability would extend to Clark) and the housing provider must pay damages. If the cotenant loses, she is out only the small claims filing fee. By placing this asymmetrical financial risk on disabled persons and housing providers, the majority's rule discourages disabled persons from seeking reasonable accommodations and discourages landlords from granting reasonable accommodations. This is contrary to the spirit of the fair housing laws.

V.

The majority accommodates the nominally adverse parties' joint request to amend the fair housing laws to require, as a matter of common law, that housing providers must deny a disabled person's request to use an assistance animal to obtain equal access housing where a cotenant with contrary interests is first in time. The majority's holding is not supported by the common law and is contrary to the letter and spirit of the fair housing laws. For these reasons, I respectfully dissent.

Oxley, J., joins this dissent.